# EXHIBIT 2

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

Wes-Flo Co., Inc.,

     Plaintiff,

vs.                                Case No: 24-CA-003592

Ball Metal Beverage Container Corp.

     Defendant.

_____/

## AMENDED COMPLAINT

     Wes-Flo Co., Inc., ("**Plaintiff**" or "**Wes-Flo**") sues Defendants, Ball Metal Beverage Container Corporation ("**Defendant**" or "**Ball Metal**"), and states:

## General Allegation

     1.    The amount in controversy is in excess of $50,000.00, exclusive of interest and attorney fees.

     2.    Venue is appropriate because the event at issue occurred in Hillsborough County, Florida.

     3.    The Plaintiff is a Florida Corporation with its principal place of business in Hillsborough County, Florida.

     4.    Defendant is a Colorado Corporation, authorized to conduct business in Florida. The Court has jurisdiction over Defendant pursuant to Florida Statute § 48.193, as Defendant, engaged in business ventures in State of Florida.

**General Facts**

5.      For all times relevant, Wes-Flo operated warehouses located at 5806 N. 53rd Street, Tampa, Florida 33610 and 5806B N. 53rd Street, Tampa, Florida 33610 (the "**53rd Street Warehouses**").

6.      Wes-Flo owned and operated warehouses located at 5707 N. 54th Street Tampa, FL 33610 and 5804 N. 54th Street, Tampa, Florida 33610 (the "**54th Street Warehouses**", and together with 53rd Street Warehouses, the "**Warehouses**") until December 30, 2021, when Wes-Flo sold the 54th Street Warehouses to a third party.  Pursuant to agreement, Wes-Flo continued to operate the 54th Street Properties and provide warehousing services to Ball Metal after sale of the 54th Street Warehouses.

7.      On July 1, 2018, Ball Metal and Wes-Flo entered into a Master Warehouse Services Agreement (the "**Lease**"), attached as **Exhibit A**.  Pursuant to the Lease, Wes-Flo provided Ball Metal with storage space and warehousing services for the Warehouses.

8.      On August 29, 2019, Wes-Flo and Ball Metal executed the Fourth Amendment to the Master Warehouse Services Agreement (the "**Amendment**"), attached as **Exhibit B**. The Amendment amended and extended the Lease through April 30, 2024.

9.      Pursuant to the Lease and the Amendment, Ball Metal agreed to pay rent, termed as "Storage Services," from May 1, 2023, through April 30, 2024, as follows: "$6.06 per Square Foot (plus or minus operating expense)" and "$103,691.65 per Month (plus any taxes)." *See* Exhibit B.

10.    Pursuant to the Lease and the Amendment, Wes-Flo regularly provided monthly invoices to Ball Metal for amounts due under the Lease and Amendment, including without limitation the Rent, as defined below.

11.    Wes-Flo has performed all of its obligations under the Lease and the Amendment.

12.    In July 2023, Ball Metal abruptly vacated the Warehouses without cause and without significant notice to Wes-Flo.

13.    Both before and after Ball Metal vacated the Warehouses, executives of Ball Metal promised and reassured Wes-Flo that it would pay the Rent, as defined below, through April 30, 2024.

14.    Wes-Flo timely sent Ball Metal invoices for the rent and other contractual obligated expenses from August 1, 2023, through April 30, 2024, which are attached as **Composite Exhibit C** (the "**Rent Invoices**"):

| Invoice Date | Due Date | Description | Amount |
|---|---|---|---|
| 8/3/2023 | 10/2/2023 | Rent & Operating Costs | $119,921.28 |
| 8/9/2023 | 10/8/2023 | Supplemental Rent | $19,091.57 |
| 9/1/2023 | 10/31/2023 | Rent & Operating Costs | $119,921.38 |
| 10/1/2023 | 11/30/2023 | Rent & Operating Costs | $119,921.28 |
| 11/1/2023 | 12/31/2023 | Rent & Operating Costs | $119,921.28 |
| 12/1/2023 | 1/30/2024 | Rent & Operating Costs | $118,800.52 |
| 1/1/2024 | 3/1/2024 | Rent & Operating Costs | $118,800.52 |
| 2/1/2024 | 4/1/2024 | Rent & Operating Costs | $118,800.52 |
| 3/1/2024 | 4/30/2024 | Rent & Operating Costs | $118,800.52 |
| 4/1/2024 | 5/31/2024 | Rent & Operating Costs | $118,800.52 |

Ball Metal refused or failed to pay any of the contractually obligated Rent Invoices.

15.    Wes-Flo timely sent Ball Metal certain invoices dated March 31, 2023, for pest control costs in the amount in the amount of $459.11 (the "**March**

3

Invoices", and together with the Rent Invoices, the "**Rent**"). The March Invoices are attached as **Composite Exhibit D**. Ball Metal refused or failed to pay the March Invoices.

16.    Ball Metal owes Wes-Flo for the Rent due under the Lease and the Amendment for a total of $1,093,238.50.

17.    Ball Metal refused or failed to pay the Rent due to Wes-Flo.

18.    Ball Metal has no grounds for refusing to pay the Rent.

## Count I – Breach of Contract

19.    Wes-Flo incorporates and restates the allegations in Paragraph 1 through 18 as if stated more fully herein.

20.    Ball Metal is contractually obligated to pay the Rent to Wes-Flo.

21.    Ball Metal materially breached the Lease and the Amendment by failing to pay the Rent.

22.    Plaintiff sustained damages in the amount of the Rent as a result to the breach of the Lease and the Amendment.

WHEREFORE, Wes-Flo demands (i) judgment against Ball Metal in favor of Wes-Flo in the amount of the unpaid Rent, (ii) interests, costs, and attorney fees; and (iii) such other relief as the Court deems necessary and just.

## Count II – Breach of Lease

23.    Wes-Flo incorporates and restates the allegations in Paragraph 1 through 18 as if stated more fully herein.

24.    For all times relevant, Ball Metal had possession of the Warehouses.

4

25.    The Lease, as modified by the Amendment, obligated Ball Metal to pay the Rent.

26.    Ball Metal failed to pay Rent Invoices.

27.    Ball Metal failed to pay the March Invoices.

28.    Ball Metal breached the Lease and the Amendment.

29.    Wes-Flo suffered damages caused by Ball Metal's breach of the Lease and the Amendment.

WHEREFORE, Wes-Flo demands (i) judgment against Ball Metal in favor of Wes-Flo in the amount of the unpaid Rent, (ii) interests, costs, and attorney fees; and (iii) such other relief as the Court deems necessary and just.

### Count III – Account Stated

30.    Wes-Flo incorporates and restates the allegations in Paragraph 1 through 18 as if stated more fully herein.

31.    Before the institution of this action, Wes-Flo and Ball Metal had business transactions between them as provided for in the Lease and Amendment.

32.    Wes-Flo rendered the Rent Invoices and the March Invoices, copies of which are attached as Composite Exhibit C and Composite Exhibit D.

33.    Each Rent Invoice and each of the March Invoices constitutes a separate account stated.

34.    The Lease requires Ball Metal to notify Wes-Flo for any disputed invoices within sixty (60) days.

35.    Ball Metal has failed to timely object to March Invoices.

36.     Ball Metal has failed to timely object to the Rent Invoices.

37.     Ball Metal owes Wes-Flo the Rent with interest on the account.

WHEREFORE, Wes-Flo demands (i) judgment against Ball Metal in favor of Wes-Flo in the amount of the account stated for the Rent, (ii) interest, costs, and attorney fees resulting from the account stated; and (iii) such other relief as the Court deems necessary and just.

DATED May 16, 2024.

/s/ Mark F. Robens
Mark F. Robens (FBN 108910)
Alma Torres (FBN 1049539)
Stichter, Riedel, Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Email for service:
      mrobens.ecf@srbp.com
      attores.ecf@srbp.com
Primary Email:
      mrobens@srbp.com
      atorres@srbp.com
Attorneys for Plaintiff

6

# Master Warehouse Services Agreement

This Master Warehouse Services Agreement, including all Exhibits attached hereto, (collectively the "Agreement") is entered into this 1st day of July, 2017 ("Effective Date"), hereto by and between Ball Metal Beverage Container Corp., a Colorado corporation, located at 9300 West 108th Circle, Westminster, Colorado 80020 ("Ball") and Wes-Flo Co., Inc., a(n) Florida corporation, having its principal place of business located at 5707 N. 54th Street Tampa, FL, 33610 ("Warehouseman") (collectively referred to herein as the "Parties" and individually as a "Party").

In consideration of the mutual promises made in this Agreement, the Parties agree to the following:

1. Storage Services. Warehouseman shall provide the storage services for Ball's beverage containers (the "Products" or "Product") in accordance with this Agreement ("Storage Services", including the terms and performance standards contained in the Exhibits, at the location or locations specified on Exhibit A for each location and the price specified on Exhibit A for each location. Storage and handling charges become applicable on the date Warehouseman assumes care, custody and control of the Product.

2. Payment Terms. Warehouseman shall invoice Ball for Storage Services performed on a weekly basis. Ball shall pay the undisputed portion of any invoice pursuant to the following payment terms: NET 60 days ACH from date of invoice. For disputed amounts, Ball shall inform Warehouseman of the nature of the dispute within sixty (60) days of the date of the invoice containing the disputed amount and the Parties agree to work in good faith to attempt to resolve the dispute.

3. Term. This Agreement shall commence on the Effective Date and shall continue in force until the expiration date specified in Exhibit A (the "Initial Term"). By providing notice to the Warehouseman no less than thirty (30) days prior to expiration of the Initial Term of this Agreement, Ball may, at its sole and unilateral discretion, renew the Agreement for any reason, including, but not limited to, the addition of other services or terms. Ball may renew the Agreement for a period not to exceed 1 year(s) on the same terms and conditions set forth in this Agreement ("Successive Term"). Either Party may terminate this Agreement upon a material breach by the other Party and the failure to cure such material breach within fifteen (15) days of receiving written notice of the same. Upon any termination of this Agreement, Ball will remove all Products from Warehouseman's premises in an orderly fashion and pay Warehouseman any outstanding charges per this Agreement for Storage Services satisfactorily performed.

4. Staffing and Equipment. Warehouseman shall be solely responsible for providing all personnel (including, but not limited to, any subcontractors providing Storage Services or related services on behalf of Warehouseman), labor, materials, supplies, equipment, warehousing and other accessories necessary to properly receive, handle, store, track, and load and secure for shipment all Product. Ball will provide bands for strapping to replace bands missing at the time of delivery to the warehouse or broken in shipment. If Warehouseman chooses to subcontract any of the Storage Services required hereunder, Warehouseman must first provide fifteen (15) days written notice pursuant to Section 22; provided, however, Ball may, in its sole discretion, reject any subcontractor chosen by Warehouseman. . If Ball is the lessee or tenant of any such warehouse(s), Warehousemen, and any of Warehouseman's subcontractors, agree to become parties, in Ball's sole discretion, to any such lease and shall comply with all provisions, obligations or liabilities set forth thereunder.

5. Inventory. Warehouseman shall maintain the Product inventory in strict accordance with Ball standards which are attached hereto as Exhibit B. All Products shall be shipped on a first-in-first-out ("FIFO") basis unless Ball expressly instructs Warehouseman to the contrary. Warehouseman shall also be responsible for the proper preparation of all bills of lading for Product in accordance with Ball's requirements. Warehouseman shall not permit and shall keep the Product free and clear of any and all liens and encumbrances arising as a result of any or omission of Warehouseman and shall immediately take all action necessary to completely remove any such lien or encumbrance.

6. Product Release. Warehouseman shall only release Product for shipment as authorized by Ball personnel.

7. Warehouse and Handling Standards. Warehouseman shall at all times during the term of this Agreement maintain its warehouse and handle the Product in strict accordance with Ball's standards attached hereto as Exhibit B.

8. Product Damage and/or Loss. Warehouseman shall immediately notify Ball of any loss or damage (including, but not limited to, any Product infested or contaminated), howsoever caused, to Product stored or handled and shall be liable to Ball for any and all loss of or damage to Product which is in Warehouseman's care, custody or

Confidential

# Exhibit "A"

Page 1 of 37



# Master Warehouse Services Agreement

control resulting from any cause except for damage or loss caused directly by Ball. Ball agrees that the specified damages for any lost or damaged Product shall be the greater of One Dollar and Seventy Five Cents ($1.75) per pound of such Product or the cost to Ball of the Product lost or damaged, with credit given for any applicable scrap value that is received. In addition, Warehouseman shall reimburse Ball for all shipping and storage costs for the lost or damaged Product as well as all costs and expenses incurred by Ball in the inspection, handling, sorting, washing, cleaning, replacing and/or scrapping of the Product and any associated packaging materials in relation to the damage or loss. Ball shall submit any claim regarding lost or damaged Product in writing to Warehouseman with reasonable supporting documentation, if any. The Parties shall work in good faith to resolve any dispute regarding the claim. Warehouseman shall pay, settle, or deny such claim (any denial shall be writing and shall include substantiating documentation) within thirty (30) days of claim submittal. In the event Warehouseman fails to reimburse Ball for the claim or any portion thereof, or Ball reasonably disagrees with Warehouseman's denial of the claim or any portion thereof, Ball, in addition to all other remedies, shall be entitled to set-off such amount against Warehouseman's invoice(s) for Storage Services.

Additionally, Warehouseman shall immediately notify Ball of any inbound Products tendered that are, or appear to be, infested, contaminated or damaged, and/or that might cause infestation, contamination or damage to the warehouse, stored Product, or other goods therein. The Parties shall determine whether such Product should be refused. Warehouseman shall have no liability for any demurrage, detention, transportation, or other charges by virtue of any such refusal unless the infestation, contamination, or damage is the result of a negligent action or omission of the Warehouseman or a violation or breach of this Agreement or any applicable procedures. Prior to scrapping or destroying any product, Warehouseman must receive written authorization from a Ball representative. If written authorization is not obtained by Warehouseman, Warehouseman will be invoiced for and agrees to pay Ball the value of the scrapped or destroyed product.

This entire Section 8 shall survive any termination or expiration of this Agreement.

9.  Insurance.
    (a) Warehouseman.
    Warehouseman shall purchase and, at all times during the term of this Agreement, maintain the following insurance policies and coverage: (i)

statutory workers' compensation coverage meeting all state and local requirements; (ii) Employer's liability insurance with a minimum coverage limit of $1,000,000 for each accident, $1,000,000 policy minimum for disease, and a $1,000,000 minimum for disease on each employee; (iii) Commercial general liability, including broad form vendors' liability, participants' and contractual liability, with limits of no less than two million dollars ($2,000,000) per occurrence and four million dollars ($4,000,000) in the aggregate and shall be written on an ISO occurrence from CG 00 01 10/01 or its equivalent, which provide coverage for liability arising from premises, operations, contractual obligations, independent contractors, products-completed operations, personal injury and advertising injury; (iv) Automobile liability insurance for bodily injury (including injury resulting in death) and loss of or damage to property in an amount not less than $1,000,000 U.S. combined single limit per occurrence and shall cover liabilities arising out of all owned, leased, hired and non-owned automobiles; (v) warehouseman's legal liability insurance - not less than $1,000,000; and (vi) all Risks Property and Casualty Insurance with limits sufficient to cover the value of Ball's Products. All policies shall include coverage for contractual liability, premises/operations liability, loading and unloading of Product. During the term of the Agreement and for three (3) years thereafter, Warehouseman shall, at its sole cost, have in effect and keep in force, insurance coverage on an occurrence basis which is primary and non-contributory as to any insurance maintained by Ball, with insurance companies maintaining an A.M. Best rating of A or better. Ball shall be named as an additional insured on all such policies, except the worker's compensation and employer's liability policies. All insurance shall also include waiver of subrogation provisions in favor of Ball. Warehouseman shall furnish to Ball true and correct copies of certificates of insurance naming Ball as an additional insured under Warehouseman's policies, including, but not limited to, its commercial general liability policy, using an additional insured endorsement that provides primary, non-contributory coverage and completed operations coverage. Warehouseman shall also furnish additional insured endorsements (in each case satisfactory to Ball) to substantiate Supplier's compliance with this Section 9. The certificates and additional insured endorsement shall specifically name "Ball Corporation and all affiliates, subsidiaries, officers, directors, agents and employees of the corporation" as additional insureds and certificate holder. Warehouseman shall provide no less than sixty (60) day prior notice of cancellation, termination or material change in coverage to Ball. In the event that Warehouseman maintains primary Commercial general liability limits less

# Master Warehouse Services Agreement

than the minimum requirements of two million dollars ($2,000,000) per occurrence, the limits may be completed by an excess or umbrella policy.

This entire Section 9 shall survive any termination or expiration of this Agreement

10. <u>Warranty</u>.    Warehouseman represents and warrants that: (i) the Storage Service will be performed in accordance with this Agreement with reasonable skill and care, and in a timely and professional manner,    in conformity with generally accepted industry standards (Including, but not limited to, performing routine inspections and service of any dock equipment at no cost to Ball) by a sufficient number of competent personnel with appropriate skills, qualifications, and experience (including, but not limited to, any subcontractors providing Storage Services or related services on behalf of Warehouseman); and (ii) Warehouseman's execution, delivery or performance of this Agreement does not constitute an infringement or violation of any proprietary rights, intellectual property rights, or confidentiality rights of any third party.    In the event Ball determines that any part of this warranty has not been met, Ball shall provide Warehouseman written notice thereof.    In the case of defective or non-conforming Storage Services, Warehouseman shall promptly re-perform such Storage Services at no additional charge or cost to Ball.

<u>This entire Section 10 shall survive any termination or expiration of this Agreement.</u>

11. <u>Indemnity.</u>    Warehouseman shall indemnify, defend and hold harmless Ball, its parent company, and their respective directors, officers, employees, subcontractors and agents harmless from and against any all claims, penalties, damages, losses, judgments, settlements, awards, costs (including reasonable attorneys' fees and expenses) and liability arising out of any action, suit, proceeding, claim, demand, investigation, or assessment made or brought by a third party arising from, relating to, or based on any of    the following:    (i) breach of this Agreement; (ii) any personal injury or death caused by any act or omission of Warehouseman, its directors, officers, employees, subcontractors, agents, assigns or invitees: (iii) any damage to property whether real or personal (other than Product) by Warehouseman, its directors, officers, employees, subcontractors, agents, assigns, or invitees; (iv) the Storage Services or other work to be provided pursuant to this Agreement; and (v) any claim or action by the Warehouseman's subcontractors arising out of Warehouseman's

breach or violation of its    subcontracting agreement.

This entire Section 11 shall survive any termination or expiration of this Agreement.

12. <u>Records/Access/Audit.</u>    At all times during the Initial Term or any Successive Term of this Agreement, Warehouseman shall develop and maintain up-to-date complete and accurate records, books, reports, and supporting documentation and information relating to all Storage Services and all other matters covered by this Agreement, including, but not limited to, records such as, and relating to, invoicing, fees, charges, claims, receipts, bills of lading, inbound/outbound shipments, inventory, damage, accounting records, orders, contracts, controls, payments, analyses, transactions, authorizations, audits, and procedures (collectively "Records"), Among other things, the Records shall at all times accurately account for all inbound and outbound shipment of Product so as to produce a continuous balance showing the number or cases or pallets of Product stored in the Warehouse at any given time.    Ball, its employees and agents, shall have full access at all times during regular business hours to the Warehouse and to all Records to conduct inspections and audits from time to time. Warehouse inspections shall be conducted by Ball utilizing, and in accordance with, the Warehouse Inspection Audit form attached hereto as Exhibit C. Additionally, for purposes of inspection of Product and inbound and outbound shipments of Product stored in the Warehouse, Ball, its employees and contractors (including, but not limited to contracted carriers and their personnel) shall not be precluded by Warehouseman from having full access at all times during regular business hours to the Warehouse.

13. <u>Relationship.</u>    In performing under this Agreement, each Party is an independent company.    Nothing in this Agreement shall be deemed or construed to create a partnership, joint venture, agency, or other joint undertaking between Warehouseman and Ball.    Each Party shall at all times maintain complete control over its personnel and operations and shall have sole responsibility for staffing, instructing, and compensating its employees and personnel. Neither Party shall have, or represent that it has, any power, right, or authority to bind the other Party or make any promises or representations on behalf of the other Party.

14. <u>Precedence.</u>    The terms and conditions of this Agreement shall supersede and take precedence over the terms and conditions contained in any other document, including, but not limited to any



# Master Warehouse Services Agreement

warehouse receipts, which are specifically objected to by Ball and expressly rejected.

15. <u>Governing Law.</u>  The laws of the state where Warehouseman will perform the Storage Services shall govern this Agreement, excluding such state's conflict of law provisions. This Section 15 shall survive any termination or expiration of this Agreement.

16. <u>Assignment.</u>  Warehouseman may not directly or indirectly assign, subcontract, distribute, delegate, or otherwise provide or convey this Agreement or any of the rights or obligations under this Agreement, in whole or in part, including by merger, assignment, change of control, governmental requirement, divestiture, operation of law or otherwise, to any third party (including to any Affiliates of Warehouseman), without the prior written consent of Ball, which consent may be withheld or refused by Ball in its sole discretion.  Any attempted assignment or delegation in violation of this Section 16 by Warehouseman shall be null and void. Ball shall be permitted to assign or delegate its rights and obligations under this Agreement to an entity that is affiliated with Ball] at any time, at Ball's sole discretion.  This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the successors and permitted assigns of each of the parties, respectively.

17. <u>Severability.</u>  If any provision or section of this Agreement is held invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision or section of this Agreement.  In such event all remaining provisions, sections, terms, and conditions of this Agreement shall continue in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.  This Section 17 shall survive any termination or expiration of this Agreement.

18. <u>Waiver</u>.  The waiver by either Party of any term, conditions, provision, or section of this Agreement or the failure of either Party to require performance of such shall not be construed as a waiver of the right to insist on strict contractual performance at some subsequent time.  The waiver by either Party of any right created by this Agreement in one or more instances shall not be construed as a continuing waiver of such right.

19. <u>Applicable Laws.</u>  Warehouseman shall at all times abide by all applicable federal, state, and local laws, statutes, rules, ordinances, regulations, procedures, executive orders, licensing requirements, directives, standards, or official guidance (collectively "Laws"), including, but not limited to, any Laws pertaining to the storage of food or beverage containers or packaging.

20. <u>Meet Competition Provision.</u>  If Ball asserts that Warehouseman's Storage Services costs for Ball's Products are higher than storage services costs for Ball's Products by a competitor of Warehouseman, then Ball shall so notify Warehouseman in writing. Within thirty (30) days of receipt of such offer from Ball, Warehouseman shall respond in writing to Ball that Warehouseman will, at its option: (i) reduce the Storage Services costs for Ball's Products to the level of the applicable competitor's storage services costs, in which case the Agreement shall continue in full force and effect; or (ii) not reduce the Storage Services costs for Ball's Products to the level of the applicable competitor's storage services costs.  If Warehouseman chooses not to meet the competitor's storage services costs, Ball may, in its sole discretion, terminate this Agreement in an orderly basis.

If Ball provides any evidence that a competitive storage service is operationally, technically and/or technologically superior to Warehouseman's Storage Services, or if a technological change is required by Ball's customers, then Warehouseman agrees that Ball may terminate its obligation to purchase the Warehouseman's Storage Services as set forth herein.

21. <u>Publicity</u>.  Neither Party shall make any news release, public announcement, advertisement, or other publicity regarding this Agreement or the other Party without such Party's prior written consent. This Section 20 shall survive any termination or expiration of this Agreement.

22. <u>Notice</u>.  Any notice provided under this Agreement shall be in writing, by hand delivery, commercial overnight courier, or registered or certified U.S. mail to the applicable address stated below:  Ball Metal Beverage Container Corp., Corporate Warehouse Manager, 9300 West 108th Circle, Westminster, CO 80021-3682, and Warehouseman's Address listed on Exhibit A.

23. <u>Equal Employment Opportunity.</u>  **Ball is an equal opportunity employer and federal contractor or subcontractor. Consequently, the parties agree that, as applicable, they will abide by the requirements of 41 CFR 60-1.4(a), 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a) and that these laws are incorporated herein by reference.  These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual**

Confidential



# Master Warehouse Services Agreement

orientation, gender identity, or national origin. These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability. The parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws.

24. <u>Entire Agreement.</u> This Agreement, including all Exhibits attached hereto and referenced herein, constitutes the entire understanding of the Parties with respect to the subject matter hereof. This Agreement may not be amended or modified except by a written instruction signed by both parties.

# Master Warehouse Services Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

WES-FLO CO., INC.                                    BALL METAL BEVERAGE CONTAINER CORP.


By: _____          By: _____
                                                            Jonathan Woelfel

Title: _____                                 Title: **Senior Specialist, Global Sourcing**
       VP


Date: ___6/30/17_____                  Date: ___6/30/2017_____

Confidential                                              Page 6 of 37

# Master Warehouse Services Agreement

## <u>Exhibit A-1 – Tampa, FL Building #1</u>

**Initial Contract Term: July 1, 2017 through June 31, 2018**
**Successive Contract Term: at Ball's sole discretion an additional 1 year term from July 1, 2018 through June 31, 2019 may be extended at the same terms and conditions.**

**Payment Terms:**
**NET 60 Days ACH (Electronic Funds Transfer)**

**Locations at which Services will be provided:**
<u>JDE #215 – Building #1</u>
5707 N. 54th Street
Tampa, FL 33610

**Hours of Operation:   24/7**

**"Storage Services" to be provided:**

**See Exhibit F, Statement of Work, for further storage and handling service details**

<u>**44"x 56" Pallet Handling Rate**</u>

\_\_\_\_    Inbound/Outbound Per Pallet of Cans & Ends $3.18 per pallet ($1.59 IN and $1.59 OUT)

<u>**44"x 56" Pallet Storage Rate**</u>

\_\_\_\_    Pallet of Cans & Ends $ 3.18 (Full Month)
Pallet of Cans & Ends $ 1.59 (Half Month)

### Other Charges or Notes

There are no Other Charges. Air bagging or blocking & bracing are provided at no charge

<u>**Delivery Charge:**</u>
Ball Tampa plant to Wes-Flo warehouse: $77.25 per truckload, plus Shuttle Freight fuel surcharge (Ball Shuttle Standard Fuel Program)

# Master Warehouse Services Agreement
## Exhibit A-2 – Tampa, FL Building #2

**Initial Contract Term: July 1, 2017 through June 31, 2020**

**Payment Terms:**
**NET 60 Days ACH (Electronic Funds Transfer)**

**Locations at which Services will be provided:**
<u>JDE #290 – Building #2</u>
5806 N. 53rd Street
Tampa, FL 33610

**Hours of Operation:   24/7**

**"Storage Services" to be provided:**

**See Exhibit F, Statement of Work, for further storage and handling service details**

<u>44"x 56" Pallet Handling Rate</u>

___     Inbound/Outbound Per Pallet of Cans & Ends $3.18 per pallet ($1.59 IN and $1.59 OUT)

<u>44"x 56" Pallet Storage Rate</u>

___     Year 1:  55,000 square feet at $4.75/sf plus utilities (with copy of bill)
        Year 2:  55,000 square feet at $4.90/sf plus utilities (with copy of bill)
        Year 3:  55,000 square feet at $5.04/sf plus utilities (with copy of bill)

### Other Charges or Notes
There are no Other Charges. Air bagging or blocking & bracing are provided at no charge

Dunnage Sorting services performed in this facility by a 3rd Party, other than Wes-Flo

<u>Delivery Charge:</u>
Ball Tampa plant to Wes-Flo warehouse: $77.25 per truckload, plus Shuttle Freight fuel surcharge (Ball Shuttle Standard Fuel Program)



Confidential                                                          Page 8 of 37

# Master Warehouse Services Agreement

## <u>Exhibit B</u>

**NOTE:**   **This policy has been excerpted from the Administrative Manual.**

**Purpose:**   To establish a procedure for inspection and qualification of leased, rented, or Ball owned warehouses.

**Scope:**   All Ball Metal Beverage Container Corporation ("Ball") leased, rented, or Ball owned warehouses.

**Detail:**   **1.0   Policy**

    1.1   All Ball products including, but not limited to, finished cans, ends, bottles, plate in coil form or cut/coated sheets, pallets, slip sheets (paper or fiber) and all other ingredients or products shall be stored or warehoused in such a manner as to prevent contamination and damage.

    1.2   This document establishes the specific procedures for warehouse qualification inspections and defines the minimal standards for acceptance.

    **2.0   Responsibilities**

    2.1   The local Ball plant Quality Assurance Manager ("QA Manager") or their designee shall be responsible for the acceptance of leased or rented warehouses and the on-going maintenance of the approved standards. The local QA Manager shall coordinate his efforts with the Ball Corporation Law Department and Corporate Real Estate Department.

    2.2   The local plant QA Manager or their designee shall perform two (2) warehouse inspections per year. Note: The Warehouse Inspection Audit-Short Form (see Exhibit D) will be used no more than once a year. The warehouse inspection audit form shall be completed at the time the inspection is performed. A copy of the form must be sent to the Quality and Logistics Departments at the Packaging Office Center (POC).

    2.3   The POC Logistics Department shall track the inspection status of all warehouse locations.

    **3.0   Authority**

    3.1   The Director of Quality Assurance shall have the authority for this procedure.

    3.2   The local Ball plant QA Manager will be responsible for ensuring the standards identified in this manual are adhered to or corrective actions are in place.

# Master Warehouse Services Agreement

**4.0   Warehouse Contract Authority**

4.1   Only POC Logistics or a designee (i.e., plant Administrative Manager) can approve a warehouse agreement.

4.2   The warehouse owner shall make available to Ball, copies of any Phase I or II environmental reports.

**5.0   Procedure**

5.1   Warehouseman Awareness and Responsibility

5.1.1   Warehouse supervisors or managers shall be aware of the need for and understand their responsibility for good sanitation and storage practices.

5.1.2   Warehouseman's warehouse supervisors shall work with Ball representatives to achieve and maintain the satisfactory levels defined in this procedure.

5.2   Subjective Ratings

5.2.1   A _YES_ rating shall be granted when the warehouse meets the requirements of this procedure.

5.2.2   An _NO_ rating is given when there is a lack of compliance with the inspection audit.

5.2.3   An exit review shall be held between the auditor and warehouse personnel to review details of the audit.  The auditor will follow up in writing to confirm the discussion.  Corrective action shall be implemented by the warehouse if needed.  A copy of the corrective action taken shall be submitted to the auditor.

5.2.4   The inspection is to cover all areas of the warehouse including nearby garages, outbuildings, locked or bonded subsections (accompanied by warehouse representative), employee personal service areas, mezzanine storage, etc., not merely those sections intended for storage of Ball material.

5.2.5   Follow-up inspections for warehouses with "NO" ratings shall be conducted by the original auditor within an agreed upon period of time. If sufficient corrections are made,  a "YES" rating may be granted.

5.3   Annual (Ongoing) Qualification Audit

5.3.1   A complete sanitation inspection of any warehouse, including review of pest control service records, shall be performed by Ball representatives in yearly intervals to monitor good sanitary maintenance, storage practices, and effective pest control.

# Master Warehouse Services Agreement

    5.3.2   Annual inspections shall be unannounced.

    5..3.3   Requalification of "NO" item(s) can occur when the requalification inspection by Ball determines that the condition which caused an "NO" rating is eliminated or corrected.  A "YES" rating may then be granted.

**6.0   Inspection Audit**

   6.1   Sanitation standards for grounds and buildings include:

    6.1.1   Bases of the building walls and adjoining yard areas are to be free of trash, litter, weeds, brush, tall grass, insects, rodent harborages or standing, pooling or stagnent water.  An 18-inch free space around the perimeter of the building is preferred.  This free space shall consist of concrete, crushed stone, or any suitable alternative and shall be void of vegetation.

    6.1.2   Grass, weeds, or other vegetation on the grounds shall be mowed or cut on a regular basis.  Yard areas are to be free of stagnant water, fire-ant colonies, and rodent burrows.

   6.2   Sanitation standards for building exterior include:

    6.2.1   The roof and walls shall be free of leaks, cracks and gaps, including,but not limited to, any light penetration through the side of any building..

    6.2.2   All old leaks, cracks and gaps shall be repaired.

    6.2.3   Windows shall be effectively screened year-round.  Functioning, hinged louvers shall be present on any fan exhausts.

    6.2.4   To minimize attraction of night flying insects, exterior lights shall <u>not</u> be located near or above doors.  No insect electrocution (light) traps are to be located <u>outside</u> the warehouse.

    6.2.5   All signs attached to the exterior walls shall be constructed to prevent bird roosting or nesting (seated flat against the wall and sealed on all sides).

    6.2.6   Driveways shall be blacktop or paved and free of trash.  Driveways shall be swept or vacuumed with such frequency to prevent dust blowing into the warehouse through open doors.

    6.2.7   Dock overhangs, eaves, or shrouds shall be free of roosting birds, birdlime, or bird nests.  Folds of shrouds of the dock door enclosures shall be in good repair and free of stagnant water in which aquatic insects or frogs can breed.

    6.2.8   Building walls and eaves shall be free of "mud-dauber" or other wasp nests and any swallow or other bird nests.

# Master Warehouse Services Agreement

6.2.9   Personnel doors shall be effectively screened (not torn) or supplied with self-closing devices.  Lintels, jambs and bases shall be free of cracks.

6.2.10  Roll-up or sliding doors shall be undamaged (no holes) and remain closed when not in service, or be supplied with hardware cloth (wire mesh), reinforced insect screening (twenty [20] mesh minimum), or be protected using air curtains switched to activate when a door starts to rise.

6.2.11  Doors shall seal tightly at the bottom and sides.

6.2.12  Fluorescent lights shall <u>not</u> be used by dock or entrance doors.

6.3   Sanitation standards for building interiors include:

6.3.1   No water leaks or evidence of prior leaks shall be present on any floor area, on vertical supports or walls, beneath doors, or in any lavatories or lunchrooms.

6.3.2   Hydraulic or mechanical dock plate areas shall be free of trash, dirt, or pallet splinters.  Gaps at the closed faces shall not be sealed, but all cracks between plates and warehouse floor shall be sealed using flexible gaskets or undamaged stiff bristled brushes designed to exclude dust, insects and rodents.

6.3.3   Warehouse floors shall be free of dirt, forklift tire abrasions, oil, grease, spillage, extensive cracks, concrete sealant chips or cracks, and broken/eroding concrete.

6.3.4   There shall be tight seals at junctures of any corrugated metal walls and floors.

6.3.5   Windows, including skylights, shall be free of broken (shattered) or missing panes of glass.

6.3.6   Ceilings and walls shall be free of loose or peeling paint or other material that may become dislodged and fall onto Ball product.  No paint over 3,000 ppm lead is permitted to be used, or existing on the paint surface closest to the cans.

6.3.7   Locker rooms shall be clean and well kept.  "Wash hands before returning to work" signs shall be displayed.  Locker room doors shall close properly.

6.3.8   No signs of mold/fungus/mildew and condensation shall be present on the walls.

6.3.9   Condensation control is a concern.  Air movement will be required to ensure condensation does not occur because metal steel cans will rust.

# Master Warehouse Services Agreement

6.3.10  Adequate roof and wall ventilation shall be installed. All incoming and outgoing air shall be screened before entering and exiting, icluding, but not limited to, supply intake louvers and bird screens on all intake and exhuast louvers.

6.3.11  Exhaust fans must having functioning, hinged louvers.

6.3.12  Florescent lights above Ball product must be shatterproof or shielded

6.4  Sanitation standards for pest control include:

6.4.1  No evidence of pests. The building shall be free of birds, birdlime, bird nest material, bird feathers, bats, bat excreta, mice, mouse nest material, and widespread presence of mouse excreta pellets. Any sightings of rats, their excreta pellets, gnaw marks, or nest material triggers an automatic "NO" rating.

6.4.2  Cats are considered "pests;" therefore, no cats are permitted on warehouse premises.

6.4.3  No evidence of insects/bugs.

6.4.4  Sample (specimen) labels along with material safety data sheets (MSDS) shall be provided to Ball representatives by the warehouse for every formulation of each pesticide used at the warehouse.

6.4.5  Warehouse mist spray (mechanically-generated aerosol) application procedures need to be approved for use inside/outside.

6.4.6  Chronological, legible copies of notes on mouse trappings (i.e., number, location, etc.), insect sightings, and comments concerning needs for improvement of sanitation shall be included in the pest control service reports, and shall be on file at the warehouse office (suspense data after three (3) years), available for Ball to review upon request.

6.4.7  A plot map of rodenticide bait stations and automatic rodent traps (KetchAlls® or MouseMasters®) used shall be on file at the warehouse. Rodenticide baits are to be contained within tamper-resistant stations (supplied with baffles, anchored in place, and lids locked) outside the warehouse only. No baits are to be used within Ball leased warehouses. Use of bait stations inside the building will result in an "NO" rating.

6.4.8  Legible (printed) service tags are to be placed on the underside of the lids of automatic mousetraps and exterior bait stations, or enclosed in waterproof sleeves or vials within each station. Tags are to include date and service representative's initials, the name of the active ingredient of rodenticide, its concentration, and an emergency telephone number (poison control hot line).

Confidential

Page 13 of 37



# Master Warehouse Services Agreement

6.4.9   Bait stations must be clean and free of debris and old bait.

6.4.10  If insect light traps (ILTs) are present, they shall be installed at right angles to door openings, not directly in front of roll-up doors or screens.

6.4.11  Warehouse shall be replace any light bulbs or ballasts immediately after a bulb or ballest goes out. Traps shall be cleaned once a month. Use scrapers and small, portable vacuums to remove all dead insect carcasses from catch trays and catch tray housings. Note: Do not use a blower/compressed air to clean catch trays or housings. Physically clean these to prevent beetle infestation.

6.4.12  Apply 5 x 8 inch service tags on the traps with space for dates and cleaner's name. Keep cleaning records on the traps, not in a sanitation notebook. Record when the bulbs were replaced.

6.5   Standards for storage practices include:

6.5.1  Warehouse management shall be aware of their responsibilities and role in providing a clean, efficient warehouse for Ball products.

6.5.2  Eigteen-inch minimum setback spaces are required between pallets and the walls. These areas shall be accessible.

6.5.3  Storage areas for Ball product shall be segregated (separated by walls, if possible) from other storage whenever possible. All Ball can and end products should be stored together.

6.5.4  Like items (i.e., same product number) shall be stored together.

6.5.5  Damaged cans, packs, pallets, or straps shall be replaced prior to shipment. Damage on incoming loads shall be recorded on the bills of lading or freight bills of carriers.

6.5.6  All production tags shall be on the front of each pallet.

6.5.7  Unshippable pallets shall be stored together and must have "hold tags" on each of the pallets.

6.5.8  The First-In First-Out (FIFO) system must be used with Ball products.

6.5.9  Slip sheets shall be clean and free of dirt.

6.5.10  Bags/pallets of ends must be in good condition prior to shipment.

6.5.11  Trailers shall be inspected or cleaned prior to shipment.

6.5.12  The following materials shall not be stored in warehouses used by Ball to avoid even the remote risk of contamination or possible absorption of malodors by can or end coatings and liners.



Confidential

Page 14 of 37



# Master Warehouse Services Agreement

A. Tires or other rubber goods. "Biologically-active" materials including, but not limited to, pesticides, fertilizers, petroleum oil lubricant (POL) products, solvents, cleaning agents, aromatic hydrocarbons, or polyethylene "beads" used in the manufacture of poly packaging films.

B. Agricultural commodities, finished foodstuffs, or loose tobacco products (either in bulk, palletized bags or tote bins including, but not ilmited to, grains, rice, corn, grits, peas, beans or lentils, nonfat dry milk solids, etc.).

C. Liquid, semi-liquid finished food ingredients, or products that will attract insects if spilled.

6.5.13 Aisles and row spacing shall be properly maintained.

6.5.14 Shipping doors shall be closed when not in use.

6.5.15 At least 12 inches of clearance shall be above the top pallet for safe handling.

6.5.16 Lighting throughout the warehouse area protected.

6.5.17 Smoking any tobacco near Ball products is not allowed.

6.5.18 Ability to be open 24 hours a day to meet plant and customer schedules.

6.5.19 Timely documentation of sales and transfer data shall be supplied to the Ball plant.

6.5.19 No diesel or gasoline forklifts shall be used in the warehouses. Electric forklifts are preferred; however, propane forklifts are acceptable. Note: Diesel and gasoline forklifts account for higher carbon monoxide levels in warehouses and relate directly to worker health and indirectly to product quality.

6.6 Standards for security include:

6.6.1 Fencing around entire warehouse, or equivalent security measures approved by a Ball representative.

6.6.2 Security gate for visitors and truckers, or equivalent security measures approved by a Ball representative.

6.6.3 Locks must be available on all exterior doors.

6.6.4 Ball storage areas shall be away from entrance doors.

6.6.5 Access to Ball products by authorized personnel only.



5/16/2024 3:32 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 21

# Master Warehouse Services Agreement

6.6.6   Visitors shall be escorted by warehouse employees or Ball representative when in the vicinity of Ball products.

6.6.7   There will be a security visitor log book.

6.6.8   Truck drivers will be logged into the log book.

6.6.9   Truck drivers movements will be restricted to certain areas.

6.6.10   Trailer seals will be affixed to all outbound trailers.

6.6.11   Installation of trailer seals will be restricted to only authorized personnel.

6.6.12   A log will be kept by the warehouse to account for the trailer seals.

6.6.13   Serial numbers from the seal must be recorded on the bill of lading.

6.6.14   All new hires by the warehouse will need background checks.

6.6.15   Inbound trailer seals will be inspected to determine if seal number is correct, broken or missing.

6.6.16   An active warehouse insurance policy with appropriate dollar amount coverage shall be in effect.

6.6.17   Insurance policy coverage (contents or building only) shall be in effect.

6.6.18   A current copy of the warehouse insurance policy shall be on file with the Corporate Risk Department in Broomfield, Colorado.

6.6.19   All outside warehouse employees responsible for handling and storage of Ball products must read, understand and comply with the requirements stated in the Product Tampering Policy (see Exhibit E).

**7.0   Report on Audits**

7.1   Copies of the inspection audits shall be forwarded to the warehouse's management, Ball plant manager, Quality and Logistics Departments at the POC, and other personnel, as necessary.

7.2   The POC Logistics Department shall enter the data from the audit into the warehouse matrix database.

**8.0   Approved Pesticides**

8.1   To comply with sanitation standards for pest control, refer to Environmental Protection Agency (EPA) requirements, and Canadian requirements when necessary, for pesticides, fungicides, and rodenticides for use around Ball products. The facility owner and/or the pesticide applicator shall be liable for determining the material usage, having the appropriate EPA approvals, and meeting the application requirements for use around Ball products.

Confidential

Page 16 of 37

# Master Warehouse Services Agreement

8.2 All pesticide application or use shall be in strict accordance with the material's label directions for such use.

8.3 The least concentration (strength) amount and frequency of application(s) shall be used.

8.4 Legally defined pesticides include all of the following:

    8.4.1 Avicides

        A. Absolutely no poisonous baits, repellents, or bird roost treatments shall be used in any Ball manufacturing location or warehouse.

        B. Similarly, bird scaring or frightening devices including, but not limited to, carbide or carbon dioxide cannons, flashing lights, imitation owls, hawks, or snakes are not to be used due to minimal effectiveness.

    8.4.2 Rodenticides

        A. No rodenticidal baits, especially liquid formulations, shall be used within buildings. Paraffin or wax based bait blocks are the preferred formulation for rodenticide baits rather than meal type or granular poly packs.

        B. The following brand names and/or primary active ingredients have EPA registration and approval numbers. **FOLLOW LABEL INSTRUCTIONS.**

- Bromethalin (Vengeance®)
- Brodifacoum (Talon®)
- Bromadiolene (Contrac®)
- Chloraphacione
- Diphacione

    8.4.3 Insecticides

        A. Any control or preventative treatments shall be of the crack and crevice or spot type, as mechanically-generated aerosol mist sprays or ultra low volume, or true fumigant gases.

        B. The following brand names and/or primary active ingredients have EPA registration and approval numbers.

- Aluminum (or Magnesium)
- Phosphide (Fumigant)
- Bendiocarb (Safrotin)
- Borate (Boric Acid) Cararyl (Sevin®)
- Chlorpyrifos (Dursban®)
- Cyfluthrin (Tempo®)
- Cypermethrin (CynOff®)



Confidential

# Master Warehouse Services Agreement

- Diazinon
- Malathion
- Methyl Bromide (Without Chlorperin as a Warning Agent)
- Methomyl (Flytek®)
- Pyrethin; Synergized
- Silica Aerogel

8.4.4   Herbicides

A.   Weed or brush killers should be broad spectrum, non cropland industrial right-of-way type.

- Alachlor (Lasso®)
- Bromacil and Diuron (Krovar®)
- Glyphosate (RoundUp) ®
- Sodium Metaborate Tetrahydrate, Sodium Chlorate, and Bromacil (i.e., Ureabar®)

## 9.0   Condition of Warehouse Facility

Warehouseman shall keep and maintain the premises of the warehouse facility in good operating condition and repair.  In this regard, Warehouseman shall be responsible for and repair and remediate all damage to the warehouse facility and its equipment, including loading docks and dock equipment (including dock doors, both roll-up or sliding doors, dock levelers, dock plates, dock overhangs, dock eves and dock shrouds). Such obligation shall include restoration of the warehouse facility and its equipment that becomes either damaged through the use of such by Warehouseman or its employees during the term of the Warehouse Services Agreement or ceases to be in good operating condition and repair as a result of the use thereof by Warehouseman or its employees.







# Master Warehouse Services Agreement

## Exhibit C
## Warehouse Inspection Audit Form

**Ball**    **Warehouse Inspection Audit ( Beverage or Food)**

| Warehouse Name: | | Date: | |
| Warehouse Address: | | Ball Auditor: | |
| | | Warehouse Phone Number: | |
| | | Warehouse Manager: | |

The following audit is a sanitation inspection of any warehouse, including review of pest control service records, sanitary maintenance, storage practices and security precautions. A Ball representative shall perform the warehouse audit to ensure high quality storage of Ball products. **A copy of each audit must be sent to the Logistics Department at the Packaging Office Center (POC).**

**Warehouse Rating System:**
Y = Yes (acceptable)   N = No (not acceptable)      N/A = Not Applicable (require explanation)

| INSPECTION AREA | Y | N | N/A |
| --- | --- | --- | --- |
| **1.) Sanitation Standards** | | | |
| A.) Grounds and Buildings | | | |
| 1.) Bases of building walls and adjoining yard areas free of trash, litter, tall grass or rodent harbourages? | ☐ | ☐ | ☐ |
| 2.) 18-inch free space around the perimeter of the building? | ☐ | ☐ | ☐ |
| 3.) Grassy areas mowed or cut on a regular basis? | ☐ | ☐ | ☐ |
| 4.) Yard areas free of stagnant water, fire ant colonies or rodent burrows? | ☐ | ☐ | ☐ |
| 5.) Driveway and parking lots are paved, swept or vacuumed and free of blowing dust? | ☐ | ☐ | ☐ |
| 6.) The surrounding neighbourhood, including industry is not potentially going to cause a hazard? | ☐ | ☐ | ☐ |
| B.) Building Exterior | | | |
| 1.) Roofs and walls free of leaks? | ☐ | ☐ | ☐ |
| 2.) Have old leaks been repaired? | ☐ | ☐ | ☐ |
| 3.) Have cracks and gaps through which insects, birds, bats or other pests may enter been sealed? | ☐ | ☐ | ☐ |
| 4.) Are windows screened? | ☐ | ☐ | ☐ |
| 5.) Do exhaust fans have functioning, hinged louvers? | ☐ | ☐ | ☐ |
| 6.) Are exterior lights positioned far enough away from doors to minimize attraction of insects? | ☐ | ☐ | ☐ |
| 7.) Are exterior signs attached in a way to prevent birds and other pests from | ☐ | ☐ | ☐ |

# Master Warehouse Services Agreement

roosting or nesting?

8.) Are driveways/parking lots swept or vacuumed to prevent dust blowing into the warehouse?

9.) Are dock overhangs, eaves and shrouds free of roosting birds, birdlime and/or nests?

10.) Are folds of shrouds in good repair and free of stagnant water and accumulation of debris?

11) Are building walls, roofs or screens free of mud-dauber or wasp nests?

12) Personnel doors effectively screened or fitted with self-closing devices?
13) Lintels, jambs and bases of doors free of cracks and gaps?
14) Are roll-up doors free of damage, closed when not in use and screened or protected with air curtains?
15) Are docks and entrance doors free of florescent lighting?

16) Do roll-up or sliding doors seal tightly at the base and sides?
17) Is the facility free of bird roosting?

Comments:

**INSPECTION AREA**

C.) Building Interior

1.) Ceiling, floors and walls free of leaks?
2.) Have old leaks been repaired?
3.) Are hydraulic or mechanical dock plate pits free of heavy or old deposits of trash, dirt or wood splinters?
4.) Are dock plates sealed at side gaps?
5.) Are floors clean and well swept?
6.) The warehouse is free of using cans improperly to store items?
7.) Are the building floors and walls free of cracks, breaks and erosion?
8.) Are the warehouse floors sealed?
9.) Are expansion cracks and joints in floors or at floor/wall junctions sealed?
10.) Are ceilings and walls free of loose or peeling paint or other materials?
11.) Are windows and skylights in good repair and free of broken glass?
12.) Are locker room/ break rooms kept clean?
13.) Are hand washing signs displayed?
14) Locker room doors close properly?
15) Ball products stored away from lockers and restrooms?
16.) Walls of the warehouse free of mold /fungus/mildew?
17.) Floors free of condensation?
18.) Is there a condensation control package mounted to a heater?
19.) Is there an air circulation unit or one built into the heater?
20.) Is there adequate air movement in the warehouse?

Confidential                     Page 20 of 37

5/16/2024 3:32 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 26

# Master Warehouse Services Agreement

21.) If outside air is used, is it screened and are screens replaced regularly?
22.) Is a "no-smoking" policy in effect within the Ball product storage area?

Comments:

| INSPECTION AREA | Y | N | N/A |
|---|---|---|---|
| D.) Pest Control | | | |
| 1.) Is the warehouse free of: | | | |
| a.) Birds? | | | |
| b.) Birdlime? | | | |
| c.) Nest material? | | | |
| d.) Mice? | | | |
| e.) Excreta pellets? | | | |
| f.) Rats? | | | |
| g.) Gnaw marks? | | | |
| h.) Cats? | | | |
| I.) Insects/bugs? | | | |
| j.) Hanging pest strips/mist applicators? | | | |
| 2.) Are specimen labels and MSDS available for all insecticides? | | | |
| 3.) Pest control firm's service reports: | | | |
| a.) Chronological order? | | | |
| b.) Legible and neat? | | | |
| c.) Notes on mouse trappings? | | | |
| d.) Insect sighting (i.e., where and what action taken)? | | | |
| e.) Comments concerning needed improved sanitation or accessibility? | | | |
| 4.) Is there a plot map including station number for all rodenticide bait stations and automatic rodent traps? | | | |
| 5.) Is ALL rodenticide used on the outside of the warehouse and NOT the inside? | | | |
| 6.) Automatic traps: | | | |
| a.) Date and service representative's initials? | | | |
| b.) Legible and neat? | | | |
| c.) Is the service tag on the inside? | | | |
| 7.) Are bait stations securely anchored in place and are they clean with fresh bait? | | | |
| 8.) Bait stations: | | | |
| a.) Are they clean? | | | |
| b.) Is the service tag on the inside? | | | |
| c.) An emergency telephone number for poison control hot line? | | | |
| 9.) Rate the use and maintenance of insect light traps (ILTs) on the following items: | | | |
| a.) Is the location about 8 to 15 feet above the floor for ceiling mounted units? | | | |
| b.) Six to 8 feet above the floor for wall mounted units? | | | |



# Master Warehouse Services Agreement

c.) Accessible for cleaning?

d.) Out of direct line of sight to outside?

e.) Are bulbs replaced annually?

f.) Cleaned regularly?

10.) Is there a written program for pest management services available?

11.) Are current licenses, such as certificates of insurance, technician certification licenses, etc., available and updated?

12.) Is documentation showing materials used, application methods, area of application and times of application used?

13.) Are MSDS and labels available on materials used?

14.) Rodenticides or rodent baits are not to be used on the interior of the facility.

15.) Foggings, ULV treatments or fumigations are not performed in the interior of the facility.

16.) Glue boards are not in use except inside bait stations.

17.) Are pest usage reports included in the Pest Control Services Manual?

Comments:

---

**INSPECTION AREA**

| | Y | N | N/A |
|---|---|---|---|

E.) Storage Practices

1.) Are the warehouse employees aware of their responsibilities and role in providing a clean, effective warehouse to store Ball products?

2.) Do all warehouse employees receive some form of training/ indoctrination regarding procedures, practices in handling food packaging materials.

3.) Is there an 18-inch perimeter setback?

4.) Is the setback area accessible?

5.) Ball product segregated from other products.

6.) Ball product stored together?

7.) Are like items (i.e., same product number) stored together in the same row?

8.) Cans, bottles, packs, pallets or straps free of damage and not exposed, including packaging?

9.) If there are any missing or damaged in question #8, is it replaced prior to shipment?

10.) Is incoming damage recorded on bills of lading or freight bills of carriers and reported to Ball?

11.) Are all production tags on the front of each pallet?

12.) Are unshippable pallets stored together?

13.) Do unshippable pallets have "hold" or "do not ship" tags attached?

14.) Is the first-in first-out (FIFO) system used with Ball inventory?

# Master Warehouse Services Agreement

15.) Are shipment records kept so traceability of each load is possible?

16.) Are slip sheets clean and free of dirt?

17.) Are the ends and cans in good condition (i.e., torn bags/boxes or other damages)?

18.) Are trailers inspected or cleaned prior to loading?

19.) Is the building free of the following contaminant materials?

      a.) Polyethylene beads?

      b.) Agriculture commodities?

      c.) Grains, rice, corn, peas, beans, etc.?

      d.) Non-fat dry milk solids?

      e.) Glass, wood, paper products and slip sheets?

      f) Any powder substances?

20.) Is the building free of the following scent-releasing contaminants?

      a.) Tires or other rubber products?

      b.) Pesticides?

      c.) Fertilizers?

      d.) Petroleum products, oil or lubricants?

      e.) Solvents and cleaning agents?

      f.) Aromatic hydrocarbons?

      g.) Foodstuffs?

      h.) Tobacco products?

      I.) Spices?

      j.) Any strong smelling (odoriferous) material?

21.) Are aisles and row spacing properly maintained?

22.) Are shipping doors open only while truck is parked at the dock?

23.) Is there at least 12 inches of clearance above the top pallet for safe handling?

24.) Is all lighting throughout the warehouse area protected?

25.) Is can/bottle environment maintained below 100 degrees at all times?

26.) Is the bottle storage area far enough away from heat source (heaters, vents, direct sunlight)?

27.) Is the warehouse able to be open 24 hours a day??

28.) Warehouse free of diesel or gasoline forklifts?

29.) Is the can/bottle storage area free of filled goods?

30.) Are rows marked out onto the floor?

31.) Are cans/bottles free of pallet contact on the sides?

32.) Are end pallets stacked 2 pallets or less in height?

33.) Are all preform containers covered with lids secured?

Comments:

Confidential



# Master Warehouse Services Agreement

| INSPECTION AREA | Y | N | N/A |
|---|---|---|---|

**2.) Security**

A.) Exterior (Building and Grounds)

    1.) Is wire fence around entire warehouse?

    2.) Is there a security gate for visitors and truckers?

    3.) Are cameras at entrance doors?

    4.) Are locks on all exterior doors?

    5.) Are dock doors closed and attended?

    6.) Are there screens over open doors?

B.) Interior

    1.) Is storage area far enough away from entrance door?

    2.) Is access to Ball products restricted to authorized personnel?

    3.) Are all visitors escorted by a warehouse employee or Ball representative when in the vicinity of Ball products?

    4.) Is there a Security Visitor Log Book?

    5.) Are truck drivers logged into the Log Book?

    6.) Are truck drivers movements restricted to certain areas?

C.) Security Procedures

    1.) Are official Ball trailer seals affixed to all out bound trailers?

    2.) Is the installation of trailer seals restricted to authorized personnel? Who?

    3.) Is a log kept by the warehouse to account for the trailer seals?

    4.) Are the serial numbers from the seal recorded on the Bill of Lading?

    5.) Are background checks done on all new hires by the warehouse?

    6.) Are in bound trailer seals inspected to determine if the seal number is correct, broken or missing?

    7.) Are official Ball trailer seals stored in a secure location?

Comments:

# Master Warehouse Services Agreement

**Corrective Action Plan**

"NO" items should be documented with the warehouse manager and corrective actions implemented. Failure to correct

"NO" items may result in **disqualification**. A copy of the corrective action plan shall be provided to the Ball representative for review.

Percentage in   =   Actual Score ("YES"   =           =           % in compliance
Compliance              Answer)           _____    _____
                    ───────────────────
                    Total Possible Score **

**\*\* (N/A)'s not counted toward the Total Possible Score.**



Confidential

# Master Warehouse Services Agreement

# EXHIBIT D

**Ball** **Warehouse Inspection Audit–Short Form (Used no more than once/year)**

| Warehouse Name: _____ | Date: _____ |
| Warehouse Address: _____ | Ball Auditor: _____ |
| | Warehouse Phone Number: _____ |
| _____ | Warehouse Manager: _____ |

The following audit is a sanitation inspection of any warehouse, including review of pest control service records, sanitary maintenance, storage practices, and security precautions. A Ball representative shall perform the warehouse audit to ensure high quality storage of Ball products. A copy of each audit must be sent to the Logistics Department at the Packaging Office Center (POC).

**Warehouse Rating System:**

Y = Yes (acceptable)    N = No (not acceptable)    N/A = Not Applicable (N/As require explanation)

| INSPECTION AREA | Y | N | N/A |
|---|---|---|---|
| 1. Is warehouse orderly and obviously clean? | | | |
| 2. Are doors and windows adequately sealed or screened to prevent pest entry? | | | |
| 3. Is there a tight seal around pipes, wires, hoses, conduits, floor drains, etc., where they pass through floors or walls of the warehouse? | | | |
| 4. Is warehouse free of insects, rodents, and bird evidence? | | | |
| 5. Is warehouse free of excessive moisture due to any of the following: roof leaks, leaking pipes or valves, condensation drips, broken windows or skylights, etc.? | | | |
| 6. Is area free of products that could cause potential odor problems with Ball products? | | | |
| 7. Are Ball products separated from all nonfood items (chemicals, soaps, detergents, pallets, batteries, pesticides, solvents, oil, etc.) or dry pet food (dog/cat food, birdseed, etc.)? | | | |
| 8. Is there a formal pest control program in place? | | | |
| 9. Is documentation showing materials used, application methods, area of application, and times of application used? | | | |
| 10. Are products stored at least 18" away from walls and not under open windows, stairways, motors, etc.? | | | |
| 11. Is the product storage area free of equipment and miscellaneous items? | | | |
| 12. Is a program in effect to ensure the oldest code date products are shipped first? | | | |
| 13. Are missing and damaged product replaced prior to shipment to customer? | | | |



# Master Warehouse Services Agreement

| | | | |
|---|---|---|---|
| 14. | Are all products put on "HOLD" clearly identified and segregated to accidental release? | | |
| 15. | Are exterior grounds free of weeds, debris, trash, damaged pallets, etc.? | | |
| 16. | Are locker rooms kept clean; hand washing signs displayed; and doors close properly? | | |
| 17. | Is a "no-smoking" policy in effect within the Ball product storage area? | | |
| 18. | Is access to Ball products restricted to authorized personnel? Have all employees read, and signed Ball Product Tampering Policy? If so, please provide to Ball a copy of all signed Policy forms to Ball for Ball's records. | | |
| 19. | Is there a security logbook and are drivers logged in? | | |
| 20. | Are truck drivers restricted to certain areas? | | |
| 21. | Is an inspection program in effect for all incoming vehicles/products and all outgoing vehicles? | | |
| 22. | Are trailer seals affixed to all out-bound trailers and serial numbers from the seal recorded on the Bill of Lading? | | |
| 23. | Are background checks done on all new hires by the warehouse? | | |
| 24. | Are in-bound trailer seals inspected to determine if the seal number is correct, broken, or missing? | | |

## COMMENTS, RECOMMENDATIONS, AND CORRECTIVE ACTION

(Please give specific explanations in the space provided below to all questions that were checked "NO." List other concerns, recommendations, or corrective actions that were noted during the inspection.)

_____

_____

_____

_____

_____

_____

Corrective Action Required:  YES ☐  NO ☐  (check one)

If Required, Date Due: _____

Follow-up inspection date by auditor:  YES _____

## TO BE COMPLETED BY GLOBAL PACKAGING LOGISTICS

| | YES | NO |
|---|---|---|
| 1.) Is there a contract in place? | | |
| 2.) Is a copy of the policy on file in the Corporate Risk Department in Broomfield, Colorado? | | |

2.) Is a copy of the policy on file in the Corporate Risk Department in Broomfield, Colorado? (Director of Corporate Risk, P.O. Box 5000, Broomfield, CO 80038-

# Master Warehouse Services Agreement

5000)
3.)  Is there a Certificate of Insurance in place?
4.)  Do we have a copy of the Warehouseman's Insurance Contract?
5.)  Does the warehouse management company perform background checks on employees?
6.)  Does the warehouse management company issue security badges to employees?

**Distribution**:
Plant Quality Control Manager (Original)
POC Quality Department
POC Logistics Department

Confidential

# Master Warehouse Services Agreement

# EXHIBIT E
## Product Tampering Policy

Ball customers place the highest possible importance on the safety, quality and integrity of their products. Ball customers' products are regulated by the government and must comply with strict guidelines regarding the package ultimately provided to the end consumer.

Although these guidelines and all customer requirements are adhered to during the manufacture of Ball customers' products Warehouseman must preserve that condition by insuring that no tampering occurs while these items are in its custody or control. The inclusion of any foreign materials, the intentional mixing of labels, or damage done to any of Ball customers' products while in Warehouseman's control is a serious event that could have a detrimental affect on Ball's relationship with its customers.

Therefore, this policy has been established to provide notice to Warehouseman employees that any tampering with Ball customers' products or materials is strictly prohibited. Warehouseman employees must understand and comply with this policy and all procedures developed to support this policy.

If a Warehouseman employee becomes aware of any damage to products or material, tampering or contamination, whether intentional or unintentional, that employee must immediately report that information to their supervisor, who must immediately report the information to Ball. Any Warehouseman employee found to be involved in a violation of this policy, whether directly or indirectly, will be subject to serious action by Ball, including possible criminal prosecution, and potential civil liability for any damages caused.

The Warehouseman employee named below affirms that he/she has read and understands this Product Tampering Policy. The Warehouseman employee also affirms that he/she will comply with the terms of this policy. Warehouseman must have this document signed by all employees and maintain this document in its records for evidence of compliance with this policy.

_____          _____
Warehouseman Employee Name                      Date


_____
Signature



# Master Warehouse Services Agreement

# EXHIBIT F-1 – Tampa, FL Building #1
## Statement of Work

**Locations at which Services will be provided:**
<u>JDE #215 – Building #1</u>
5707 N. 54th Street
Tampa, FL 33610

**Hours of Operation:   24/7**

## <u>Warehousing Operations</u>

**General Information:**

The can pallet size is 44" x 56" x 108" and weighs approximately 400 pounds (12 oz. cans) which requires approximately 26-29 sq. ft. including aisles, product staging & honeycombing effects. The end (a.k.a. lid) pallet size is 44" x 56" x 66", can be stacked 2 high. Empty aluminum beer and beverage cans palletized in bulk are exposed to all surrounding environmental conditions. The empty can may absorb strong or pungent odors and will also be damaged by contaminants such as (but not limited to): dust, water, dirt, insects, foreign debris, leaking equipment chemicals, etc. The empty cans are also susceptible to damage from material handling equipment and improper transporting. Extreme care must be taken to stack, unstack, load, unload and transport every pallet of Ball product.

All can products are palletized and transported into the warehouse via full truck loads with 25 pallets pin wheeled <u>inbound</u> or 24 pallets straight loaded <u>outbound</u>.  Pallets may be stacked up to 4 pallets high, provided the facility has appropriate clear height, and may be transported double-wide.

All outbound trailers must have a numbered Ball trailer seal applied by the warehouse service provider. Ball will provide the appropriate trailer seals. All trailers must be inspected prior to loading for proper quality and safe operating conditions. This includes (but not limited to): strong or offensive odors, water leaks, holes in the floor or walls, inoperable doors, debris on the trailer floor, etc.

All pallets must be stored by using the "First-In First-Out" FIFO method. All inventory is tracked in the Ball system called JD Edwards One World. The proper computer equipment (terminal, printer, and secure data line) will be provided by BPC, and the selected provider must use this system to receive, transfer, ship, validate inventory, view orders, etc. Although not required, the warehouseman may also use any in-house WMS system preferred for redundancy and/or additional reporting or billing capability. Standard Ball payment terms are 15/31 (or last day of month) second month proxy for all suppliers with only one (1) normal invoice submission to Ball per month (monthly billing). This contract will not guarantee a minimum volume and will be a requirements only multi-year contract.

# Master Warehouse Services Agreement

**Warehouse Building & Equipment Details:**

The warehouseman is responsible for a daily inspection of the warehouse building to ensure proper operating conditions exist for a food grade and safe environment. This includes (but not limited to): roof leaks, trash, insect/animal infestation, airborne contamination, unsafe or inoperable dock and material handling equipment, standing water, damaged concrete floor, unsafe or non-complaint exterior building, driveway and vegetation conditions, wall and door cracks/gaps, debris build-up on the warehouse floor, peeling paint and interior warehouse condensation. The warehouse provider must prepare accordingly and be present for all Customer and Ball Corporation quality inspections estimated at 1-2 visits per year.

The warehouseman is responsible for all housekeeping tasks in the office, product storage area, restrooms, break room and all other spaces inside of the building. Dock and warehouse equipment maintenance, repair or replacement which includes: dock levelers, dock doors, dock shelters/shrouds, dock locks, dock lights and overhead warehouse lights/light bulbs are the responsibility of the warehouseman. Any accidental damage to the dock equipment, building walls, warehouse structures, support columns, office and all other spaces inside and outside of the warehouse are the responsibility of the warehouse provider. The selected warehouseman will be expected to make reasonable attempts to backfill any seasonal or available warehouse space. Routine maintenance or certification or fire extinguishers, pressure testing, sprinklers and/or ESFR (Early Suppression, Fast Response) are the warehouseman's fiscal and operational responsibility. Liquid propane (LP) or electric powered forklifts with single-double pallet handling attachments are acceptable for use.

**Warehouse Inbound Activity:**

All inbound trailers from the supplying Ball plants must be unloaded in a timely manner so as to avoid excess drop trailers by the inbound carriers and/or driver detention charges. The inbound truckload volume has a certain level of inconsistency. The inbound Ball plant(s) will work with the warehouseman (within reason) to spread out the quantity of inbound loads. It is expected that inbound trailers will be emptied within a reasonable time frame. Any pallets of cans or ends received with excess damage should be documented, communicated, photographed and held. Damaged and/or non-conforming product disposition will be determined by the Ball plant, in conjunction with the supplying Ball plant if necessary. Pallets may arrive to the warehouse in a "pin wheeled" trailer loading configuration, in which all of the pallets down one side of the trailer are turned 90 degrees. Care must be taken when unloading pallets in this type of configuration as the load is a tighter fit than the normal "straight" load. Intermodal loads will arrive in a container, and often contain cardboard void fillers. Loads of Ends (a.k.a Lids) are likely to arrive with the two pallets (nearest the trailer doors) covered with large plastic bags, to prevent contamination from the elements.

Confidential

Page 31 of 37



# Master Warehouse Services Agreement

**Can/End Pallet Prepping Specifics:**

All pallets must be prepped at the warehouse in accordance with Ball and/or Customer requirements for delivery. The pallets must be inspected for the following conditions (this list is not all inclusive but should only be used as a general guideline): missing cans, damaged cans, broken plastic pallets, contaminated plastic packaging materials, wet cans, dented cans, broken or missing plastic banding straps, severely shifted straps (not common), largely torn or bent tier sheets, and major obvious decoration/ink errors. All damaged or missing cans must be removed. If can replacement is needed, new good quality cans of the same item number must be used. Promotional cans and other special label variations require same replacement. Once a can falls out or is removed from a pallet and touches the floor it must be replaced with a new can. Banding material and banding equipment must be supplied by the warehouseman for the infrequent event when a plastic pallet band breaks. If the banding equipment is pneumatic powered, then an air compressor must be provided by the selected warehouse provider.

Cans, regardless of storage time, prior to shipment shall be inspected for handling damage, dust and dirt, loose banding and any type of defect that would render the product or package undesirable to the customer. All trash and debris must be completely removed from the pallet openings and from the top of the pallet (inside the top frame). The visible exterior layer of cans must be inspected on all 4 sides of each pallet. Inbound pallet damage, restacking and/or banding labor must be included in the proposed handling rate. Plastic pallet separation occurs infrequently and is very often easy to repair. The 3 piece pallets are not purchased any more by Ball and will eventually be extinct from the system. Full pallets of cans with a broken plastic pallet must be transferred to a good usable pallet. This is achieved by sliding the entire pallet of cans onto a new pallet manually by pulling the bottom plastic tier sheet (rarely needed procedure).

If needed, a reasonable quantity of donor/filler pallets will be provided at no cost to the warehouse provider. The cost of dropped or significantly damaged pallets will be the responsibility of warehouseman. The cost per pallet of cans is approximately $400-700. The vast majority of the inventory is at the lower cost estimate. The cost per pallet of ends is approximately $10,000-12,000.

The paper pallet identification tickets (1 per pallet) must be removed before each pallet is loaded outbound to the brewery or customer. These tickets are scanned into the Ball JDE inventory system. The warehouse service provider will be required to use a visible *split load* label change notification document & physical pallet indicator on every load that contains more than one item number of cans. The JDE system should not be used as a WMS, as it is used by Ball for basic inventory management at our warehouses. It does have bay location functionality and RF capability. The DSI program is used on RF capable forklift terminals (if applicable). Unique pallet tickets must not be switched to a different pallet of cans. Replacement pallet tickets will be handled by the Rome Ball plant.

**Sales Order Entry & Change Order Requirements:**

Infrequently, sales orders may change and be communicated to the warehouse provider by the Ball plant. Sales order changes may include the following (but not limited to): item number change, quantity change and scheduled delivery time change. In the infrequent event of an ASAP change order request, the time to respond with an accurate delivery to the Customer.

# Master Warehouse Services Agreement

**Other Warehouse Duties:**

Cycle counts and on-demand spot inventories are to be performed when requested by Ball. Cycle counts are typically done weekly by the warehouse provider and a full physical inventory is performed yearly by Ball plant personnel and the warehouseman's warehouse personnel in accordance with corporation standards. On demand item inventory counts can occur a few times per year (3-4 times per year is common) if Ball experiences shortages in product and the physical inventory does not match the system count. Infrequent special inspection of product must be performed when requested. Ball QA may call for several pallets to be set down for additional inspection to be performed at the outside warehouse (not common). It is highly recommended to keep the scrap, contaminated and donor/filler pallets separated from the finished goods pallets in a labeled hold area.





# Master Warehouse Services Agreement

# EXHIBIT F-2 – Tampa, FL Building #2
## Statement of Work

**Locations at which Services will be provided:**
**JDE #290 – Building #2**
5806 N. 53rd Street
Tampa, FL 33610

**Hours of Operation:  24/7**

## Warehousing Operations

**General Information:**

The can pallet size is 44" x 56" x 108" and weighs approximately 400 pounds (12 oz. cans) which requires approximately 26-29 sq. ft. including aisles, product staging & honeycombing effects. The end (a.k.a. lid) pallet size is 44" x 56" x 66", can be stacked 2 high. Empty aluminum beer and beverage cans palletized in bulk are exposed to all surrounding environmental conditions. The empty can may absorb strong or pungent odors and will also be damaged by contaminants such as (but not limited to): dust, water, dirt, insects, foreign debris, leaking equipment chemicals, etc. The empty cans are also susceptible to damage from material handling equipment and improper transporting. Extreme care must be taken to stack, unstack, load, unload and transport every pallet of Ball product.

All can products are palletized and transported into the warehouse via full truck loads with 25 pallets pin wheeled <u>inbound</u> or 24 pallets straight loaded <u>outbound</u>.  Pallets may be stacked up to 4 pallets high, provided the facility has appropriate clear height, and may be transported double-wide.

All outbound trailers must have a numbered Ball trailer seal applied by the warehouse service provider. Ball will provide the appropriate trailer seals. All trailers must be inspected prior to loading for proper quality and safe operating conditions. This includes (but not limited to): strong or offensive odors, water leaks, holes in the floor or walls, inoperable doors, debris on the trailer floor, etc.

All pallets must be stored by using the "First-In First-Out" FIFO method. All inventory is tracked in the Ball system called JD Edwards One World. The proper computer equipment (terminal, printer, and secure data line) will be provided by BPC, and the selected provider must use this system to receive, transfer, ship, validate inventory, view orders, etc. Although not required, the warehouseman may also use any in-house WMS system preferred for redundancy and/or additional reporting or billing capability. Standard Ball payment terms are 15/31 (or last day of month) second month proxy for all suppliers with only one (1) normal invoice submission to Ball per month (monthly billing). This contract will not guarantee a minimum volume and will be a requirements only multi-year contract.

# Master Warehouse Services Agreement

**Warehouse Building & Equipment Details:**

The warehouseman is responsible for a daily inspection of the warehouse building to ensure proper operating conditions exist for a food grade and safe environment. This includes (but not limited to): roof leaks, trash, insect/animal infestation, airborne contamination, unsafe or inoperable dock and material handling equipment, standing water, damaged concrete floor, unsafe or non-complaint exterior building, driveway and vegetation conditions, wall and door cracks/gaps, debris build-up on the warehouse floor, peeling paint and interior warehouse condensation. The warehouse provider must prepare accordingly and be present for all Customer and Ball Corporation quality inspections estimated at 1-2 visits per year.

The warehouseman is responsible for all housekeeping tasks in the office, product storage area, restrooms, break room and all other spaces inside of the building. Dock and warehouse equipment maintenance, repair or replacement which includes: dock levelers, dock doors, dock shelters/shrouds, dock locks, dock lights and overhead warehouse lights/light bulbs are the responsibility of the warehouseman. Any accidental damage to the dock equipment, building walls, warehouse structures, support columns, office and all other spaces inside and outside of the warehouse are the responsibility of the warehouse provider. The selected warehouseman will be expected to make reasonable attempts to backfill any seasonal or available warehouse space. Routine maintenance or certification or fire extinguishers, pressure testing, sprinklers and/or ESFR (Early Suppression, Fast Response) are the warehouseman's fiscal and operational responsibility. Liquid propane (LP) or electric powered forklifts with single-double pallet handling attachments are acceptable for use.

**Warehouse Inbound Activity:**

All inbound trailers from the supplying Ball plants must be unloaded in a timely manner so as to avoid excess drop trailers by the inbound carriers and/or driver detention charges. The inbound truckload volume has a certain level of inconsistency. The inbound Ball plant(s) will work with the warehouseman (within reason) to spread out the quantity of inbound loads. It is expected that inbound trailers will be emptied within a reasonable time frame. Any pallets of cans or ends received with excess damage should be documented, communicated, photographed and held. Damaged and/or non-conforming product disposition will be determined by the Ball plant, in conjunction with the supplying Ball plant if necessary. Pallets may arrive to the warehouse in a "pin wheeled" trailer loading configuration, in which all of the pallets down one side of the trailer are turned 90 degrees. Care must be taken when unloading pallets in this type of configuration as the load is a tighter fit than the normal "straight" load. Intermodal loads will arrive in a container, and often contain cardboard void fillers. Loads of Ends (a.k.a Lids) are likely to arrive with the two pallets (nearest the trailer doors) covered with large plastic bags, to prevent contamination from the elements.



Confidential                                    Page 35 of 37

# Master Warehouse Services Agreement

**Can/End Pallet Prepping Specifics:**

All pallets must be prepped at the warehouse in accordance with Ball and/or Customer requirements for delivery. The pallets must be inspected for the following conditions (this list is not all inclusive but should only be used as a general guideline): missing cans, damaged cans, broken plastic pallets, contaminated plastic packaging materials, wet cans, dented cans, broken or missing plastic banding straps, severely shifted straps (not common), largely torn or bent tier sheets, and major obvious decoration/ink errors. All damaged or missing cans must be removed. If can replacement is needed, new good quality cans of the same item number must be used. Promotional cans and other special label variations require same replacement. Once a can falls out or is removed from a pallet and touches the floor it must be replaced with a new can. Banding material and banding equipment must be supplied by the warehouseman for the infrequent event when a plastic pallet band breaks. If the banding equipment is pneumatic powered, then an air compressor must be provided by the selected warehouse provider.

Cans, regardless of storage time, prior to shipment shall be inspected for handling damage, dust and dirt, loose banding and any type of defect that would render the product or package undesirable to the customer. All trash and debris must be completely removed from the pallet openings and from the top of the pallet (inside the top frame). The visible exterior layer of cans must be inspected on all 4 sides of each pallet. Inbound pallet damage, restacking and/or banding labor must be included in the proposed handling rate. Plastic pallet separation occurs infrequently and is very often easy to repair. The 3 piece pallets are not purchased any more by Ball and will eventually be extinct from the system. Full pallets of cans with a broken plastic pallet must be transferred to a good usable pallet. This is achieved by sliding the entire pallet of cans onto a new pallet manually by pulling the bottom plastic tier sheet (rarely needed procedure).

If needed, a reasonable quantity of donor/filler pallets will be provided at no cost to the warehouse provider. The cost of dropped or significantly damaged pallets will be the responsibility of warehouseman. The cost per pallet of cans is approximately $400-700. The vast majority of the inventory is at the lower cost estimate. The cost per pallet of ends is approximately $10,000-12,000.

The paper pallet identification tickets (1 per pallet) must be removed before each pallet is loaded outbound to the brewery or customer. These tickets are scanned into the Ball JDE inventory system. The warehouse service provider will be required to use a visible *split load* label change notification document & physical pallet indicator on every load that contains more than one item number of cans. The JDE system should not be used as a WMS, as it is used by Ball for basic inventory management at our warehouses. It does have bay location functionality and RF capability. The DSI program is used on RF capable forklift terminals (if applicable). Unique pallet tickets must not be switched to a different pallet of cans. Replacement pallet tickets will be handled by the Rome Ball plant.

**Sales Order Entry & Change Order Requirements:**

Infrequently, sales orders may change and be communicated to the warehouse provider by the Ball plant. Sales order changes may include the following (but not limited to): item number change, quantity change and scheduled delivery time change. In the infrequent event of an ASAP change order request, the time to respond with an accurate delivery to the Customer.

# Master Warehouse Services Agreement

**Other Warehouse Duties:**

Cycle counts and on-demand spot inventories are to be performed when requested by Ball. Cycle counts are typically done weekly by the warehouse provider and a full physical inventory is performed yearly by Ball plant personnel and the warehouseman's warehouse personnel in accordance with corporation standards. On demand item inventory counts can occur a few times per year (3-4 times per year is common) if Ball experiences shortages in product and the physical inventory does not match the system count. Infrequent special inspection of product must be performed when requested. Ball QA may call for several pallets to be set down for additional inspection to be performed at the outside warehouse (not common). It is highly recommended to keep the scrap, contaminated and donor/filler pallets separated from the finished goods pallets in a labeled hold area.

**Warehouse Packaging Sorting Activity:**

This warehouse is used for cross-docking of returned reusable plastic packaging (pallets, top frames and tier sheets) from the customers to the Ball supplying plant(s). There is a 3rd party packaging sorting company, CTPS, which works in a portion of this warehouse space (approximate average 30,000 sq. ft.). Warehouseman is required to work harmoniously with this supplier in a shared working environment. This includes the sharing of office, break room, employee parking, docks and restrooms. The packaging material returns have a certain level of seasonality as more returns occur in the summer months. The packaging sorting and breakdown working area must be kept free and clear. This space is not to be used for can storage unless prior approval is received from Ball and CTPS.

# Warehouse Services Agreement

## Exhibit A-2 Tampa, FL

**Contract Period: August 1, 2021 through April 30, 2024**

**Locations at which Services will be provided:**

**Warehouse #290 – 55,000 Square Feet**
**5806 N. 53rd St**
**Tampa, Fl. 33610**

**Warehouse #293 – 150,330 Square Feet**
**5806B N. 53rd St**
**Tampa, Fl. 33610**

**205,330 Square Feet Total**

**Payment Terms:**
**NET 60 ACH**

**Hours of Operation:   24/7 availability**

**Handling Rate:**
December 1, 2020 through April 30, 2021

_____       $ 3.28 per Pallet

May 1, 2021 through April 30, 2022
_____$ 3.41 per Pallet

May 1, 2022 through April 30, 2023
_____$ 3.55 per Pallet

May 1,  2023 through April 30, 2024
_____$ 3.67 per Pallet

**"Storage Services" to be provided:**

**Storage Rate:  (To be held December 2020 through April 2021)**

# Exhibit "B"

___    $ 5.65 per Square Foot (plus or minus operating expense)
___    $96,676.21 per Month (plus any taxes)


**Storage Rate: (To be held for one year period beginning May 1, 2021 and ending April 30, 2022)**

___    $ 5.80 per Square Foot (plus or minus operating expense)
___    $99,242.83 per Month (plus any taxes)


**Storage Rate: (To be held for one year period beginning May 1, 2022 and ending April 30, 2023)**

___    $ 5.93 per Square Foot (plus or minus operating expense)
___    $ 101,467.24 per Month (plus any taxes)


**Storage Rate: (To be held for one year period beginning May 1, 2023 and ending April 30, 2024)**

___    $ 6.06 per Square Foot (plus or minus operating expense)
___    $ 103,691.65 per Month (plus any taxes)


**Other Charges or Notes (If Applicable)**

There are no other charges. Air bagging or blocking & bracing are provided at no charge.

Delivery Charge:
Ball Tampa Plant to Wes-Flo warehouse $83.25 per truckload, plus shuttle freight fuel surcharge
(Ball standard shuttle fuel program). Good through April 30, 2021

# Warehouse Services Agreement

## Exhibit F-2 – Tampa, FL

## Warehousing Operations

General Information:

The can pallet size is 44" x 56" x 108" and weighs approximately 400 pounds (12 oz. cans) which requires approximately 26-29 sq. ft. including aisles, product staging & honeycombing effects. The end (a.k.a. lid) pallet size is 44" x 56" x 66", and weighs up to approximately 2,300 pounds) can be stacked 2 high. Empty aluminum beer and beverage cans palletized in bulk are exposed to all surrounding environmental conditions. The empty can may absorb strong or pungent odors and will also be damaged by contaminants such as (but not limited to): dust, water, dirt, insects, foreign debris, leaking equipment chemicals, etc. The empty cans are also susceptible to damage from material handling equipment and improper transporting. Extreme care must be taken to stack, unstack, load, unload and transport every pallet of Ball product.

All can products are palletized and transported into the warehouse via full truck loads with 25 pallets pin wheeled inbound or 22 pallets straight loaded outbound. Pallets may be stacked up to 4 pallets high, provided the facility has appropriate clear height, and may be transported double-wide.

All outbound trailers must have a numbered Ball trailer seal applied by the warehouse service provider. Ball will provide the appropriate trailer seals. All trailers must be inspected prior to loading for proper quality and safe operating conditions. This includes (but not limited to): strong or offensive odors, water leaks, holes in the floor or walls, inoperable doors, debris on the trailer floor, etc.

All pallets must be stored by using the "First-In First-Out" FIFO method. All inventory is tracked in the Ball system called JD Edwards One World. The proper computer equipment (terminal, printer, and secure data line) will be provided by BPC, and the selected provider must use this system to receive, transfer, ship, validate inventory, view orders, etc. Although not required, the warehouseman may also use any in-house WMS system preferred for redundancy and/or additional reporting or billing capability.


**Warehouse Building & Equipment Details:**
The warehouseman is responsible for a daily inspection of the warehouse building to ensure proper operating conditions exist for a food grade and safe environment. This includes (but not limited to): roof leaks, trash, insect/animal infestation, airborne contamination, unsafe or inoperable dock and material handling equipment, standing water, damaged concrete floor, unsafe or non-complaint exterior building, driveway and vegetation conditions, wall and door cracks/gaps, debris build-up on the warehouse floor, peeling paint and interior warehouse condensation. The warehouse provider must prepare accordingly and be present for all Customer and Ball Corporation quality inspections estimated at 1-2 visits per year.

The warehouseman is responsible for all housekeeping tasks in the office, product storage area, restrooms, break room and all other spaces inside of the building. Dock and warehouse equipment maintenance, repair or replacement which includes: dock levelers, dock doors, dock shelters/shrouds, dock locks, dock lights and overhead warehouse lights/light bulbs are the fiscal

responsibility of BPC (Ball leased warehouse facility), and warehouseman is expected to help facilitate on site services as needed. Any accidental damage caused by warehouseman to the dock equipment, building walls, warehouse structures, support columns, office and all other spaces inside and outside of the warehouse are the responsibility of the warehouse provider. The selected warehouseman will be expected to make reasonable attempts to backfill any seasonal or available warehouse space. Routine maintenance or certification or fire extinguishers, pressure testing, sprinklers and/or ESFR (Early Suppression, Fast Response) are the BPC's fiscal responsibility and warehouseman is expected to facilitate operationally. Liquid propane (LP) or electric powered forklifts with single-double pallet handling attachments are acceptable for use.

### Warehouse Inbound Activity:

All inbound trailers from the supplying Ball plants must be unloaded in a timely manner so as to avoid excess drop trailers by the inbound carriers and/or driver detention charges. The inbound truckload volume has a certain level of inconsistency. The inbound Ball plant(s) will work with the warehouseman (within reason) to spread out the quantity of inbound loads. It is expected that inbound trailers will be emptied within a reasonable time frame. Any pallets of cans or ends received with excess damage should be documented, communicated, photographed and held. Damaged and/or non-conforming product disposition will be determined by the Ball plant, in conjunction with the supplying Ball plant if necessary. Pallets may arrive to the warehouse in a "pin wheeled" trailer loading configuration, in which all of the pallets down one side of the trailer are turned 90 degrees. Care must be taken when unloading pallets in this type of configuration as the load is a tighter fit than the normal "straight" load. Intermodal loads will arrive in a container, and often contain cardboard void fillers. Loads of Ends (a.k.a Lids) are likely to arrive with the two pallets (nearest the trailer doors) covered with large plastic bags, to prevent contamination from the elements.

### Can/End Pallet Prepping Specifics:

All pallets must be prepped at the warehouse in accordance with Ball and/or Customer requirements for delivery. The pallets must be inspected for the following conditions (this list is not all inclusive but should only be used as a general guideline): missing cans, damaged cans, broken plastic pallets, contaminated plastic packaging materials, wet cans, dented cans, broken or missing plastic banding straps, severely shifted straps (not common), largely torn or bent tier sheets, and major obvious decoration/ink errors. All damaged or missing cans must be removed. If can replacement is needed, new good quality cans of the same item number must be used. Promotional cans and other special label variations require same replacement. Once a can falls out or is removed from a pallet and touches the floor it must be replaced with a new can. Banding material and banding equipment must be supplied by the warehouseman for the

infrequent event when a plastic pallet band breaks. If the banding equipment is pneumatic powered, then an air compressor must be provided by the selected warehouse provider.

Cans, regardless of storage time, prior to shipment shall be inspected for handling damage, dust and dirt, loose banding and any type of defect that would render the product or package undesirable to the customer. All trash and debris must be completely removed from the pallet openings and from the top of the pallet (inside the top frame). The visible exterior layer of cans must be inspected on all 4 sides of each pallet. Inbound pallet damage, restacking and/or banding labor must be included in the proposed handling rate. Plastic pallet separation occurs infrequently and is very often easy to repair. The 3 piece pallets are not purchased any more by Ball and will eventually be extinct from the system. Full pallets of cans with a broken plastic pallet must be transferred to a good usable pallet. This is achieved by sliding the entire pallet of cans onto a new pallet manually by pulling the bottom plastic tier sheet (rarely needed procedure).

If needed, a reasonable quantity of donor/filler pallets will be provided at no cost to the warehouse provider. The cost of dropped or significantly damaged pallets will be the responsibility of warehouseman. The cost per pallet of cans is approximately $400-700. The vast majority of the inventory is at the lower cost estimate. The cost per pallet of ends is approximately $10,000-12,000.

The paper pallet identification tickets (1 per pallet) must be removed before each pallet is loaded outbound to the brewery or customer. These tickets are scanned into the Ball JDE inventory system. **The warehouse service provider will be required to use a visible *split load* label change notification document & physical pallet indicator on every load that contains more than one item number of cans. The JDE system should not be used as a WMS, as it is used by Ball for basic inventory management at our warehouses. It does have bay location functionality and RF capability. The DSI program is used on RF capable forklift terminals (if applicable). Unique pallet tickets must not be switched to a different pallet of cans. Replacement pallet tickets will be handled by the Rome Ball plant.**

**Sales Order Entry & Change Order Requirements:**

Infrequently, sales orders may change and be communicated to the warehouse provider by the Ball plant. Sales order changes may include the following (but not limited to): item number change, quantity change and scheduled delivery time change. In the infrequent event of an ASAP change order request, the time to respond with an accurate delivery to the Customer.


**Other Warehouse Duties:**

Cycle counts and on-demand spot inventories are to be performed when requested by Ball. Cycle counts are typically done weekly by the warehouse provider and a full physical inventory is performed yearly by Ball plant personnel and the warehouseman's warehouse personnel in accordance with corporation standards.  On demand item inventory counts can occur a few times per year (3-4 times per year is common) if Ball experiences shortages in product and the physical inventory does not match the system count. Infrequent special inspection of product must be performed when requested.  Ball QA may call for several pallets to be set down for additional inspection to be performed at the outside warehouse (not common).  It is highly

recommended to keep the scrap, contaminated and donor/filler pallets separated from the finished goods pallets in a labeled hold area.

**Warehouse Services Key Performance Indicators (KPIs)**

Warehouseman required to record all KPI data daily, and report to Ball upon request

- SAFETY: 100% - Lost time and recordable incidents
- INVENTORY ACCURACY: 99.5% - Pallet location accuracy
- SHIPPING ACCURACY: 99.5% - Shipments vs. Shipments scheduled
- Damage to finished goods: number of pallets damaged
- Damages to building, equipment, etc.: list damaged item(s) and approximate repair/replacement cost
- Trucks unloaded/loaded per shift: number of trucks
- Carrier detention events: number of events, approximate detention time (# hours), and root cause of delay
- Damage received at outside warehouse/customer: # of damaged pallets received at outside location
- Incorrect BOL: # of incorrect BOL incidents
- Turnover: track employee/temporary employee turnover
- Absentee/Call off:
- Overtime: Measured in number of hours and dollar value
- Volume: Inbound/Outbound activity

# FOURTH AMENDMENT TO THE MASTER WAREHOUSE SERVICES AGREEMENT

This FOURTH AMENDMENT (the "Fourth Amendment") to the   MASTER WAREHOUSE SERVICES AGREEMENT is made as of the 29th day of August, 2019 ("Effective Date"), by and between Ball Metal Beverage Container Corp., a Colorado company ("Ball") Wes-Flo Co., Inc. ("Wes-Flo"), a Florida corporation ("Wes-Flo" or "Warehouseman").

## RECITALS:

Ball and Wes-Flo are parties to the Master Warehouse Services Agreement dated July 1, 2017, (the "Original Agreement"), by and between Ball and Wes-Flo;

This Fourth Amendment and the Original Agreement are collectively referred to herein as the "Agreement".

## AGREEMENT:

In consideration of the foregoing recitals, which are incorporated herein, all amounts paid by Ball to Wes-Flo, the mutual promises herein contained and all other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Ball and Wes-Flo hereby agree as follows:

1. The new expiration date of the Agreement shall be extended three years to the date of April 30, 2024 for warehouse numbers 290 and 293
2. Herein, Ball will begin incorporating the KPIs referenced in exhibit F-2 to monitor and manage effectiveness of Warehouseman

Ball and Wes-Flo have caused this Fourth Amendment to be executed on the Effective Date.

WES-FLO CO, INC.

By: _____

Printed Name: Jim Perry

Title: Vice PRESIDENT

BALL METAL BEVERAGE CONTAINER CORP.

By: Sam Sternburg

Printed Name: ___Sam Sternburg_____

Title: __Senior Buyer_____

# Invoice

**WES FLO Co., Inc.**

PO Box 17401
Tampa FL  33682-7401

*PAST DUE*

| Date | Invoice # |
|------|-----------|
| 8/3/2023 | 3255741A |

| Bill To | Ship To |
|---------|---------|
| Ball Corporation<br>PO Box 589<br>Broomfield, CO 80038-0589<br>email: supplierenablement@ball.com | Ball Corporation<br>email: pkgapwarehouse@ball.com |

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| August Rent | Net 60 | 10/2/2023 | 8/3/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.07 | 7,845.32 |

Thank you for your business!

| | Total | $119,921.28 |
|--|-------|-------------|

| Phone # | Fax # | E-mail | | |
|---------|-------|--------|--|--|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | Balance Due | $119,921.28 |

# Exhibit "C"



**WES FLO** Co., Inc.

PO Box 17401
Tampa FL  33682-7401

# Invoice

PAST DUE

| Date | Invoice # |
|------|-----------|
| 8/9/2023 | 3255742A |

| Bill To | Ship To |
|---------|---------|
| Ball Corporation<br>PO Box 589<br>Broomfield, CO 80038-0589<br>email: supplierenablement@ball.com | Ball Corporation<br>email: pkgapwarehouse@ball.com |

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| Op Exp Rec's | Net 60 | 10/8/2023 | 8/9/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| 2022 operating Expense Reconciliation<br>Grounds: Landscaping,Trimming, Irrigation<br>Parking Maintenance: Asphalt/pot holes repair<br>General Maintenance: Roof, Alarm, Fire inspections and repairs | 1 | 19,091.57 | 19,091.57 |

Thank you for your business!

| | **Total** | $19,091.57 |
|--|-----------|-----------|

| Phone # | Fax # | E-mail | | |
|---------|-------|--------|--|--|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | **Balance Due** | $19,091.57 |

 **Co., Inc.**

# Invoice

PO Box 17401
Tampa FL 33682-7401

*PAST DUE*

| Date | Invoice # |
|------|-----------|
| 9/1/2023 | 3255743A |

| **Bill To** | **Ship To** |
|-------------|-------------|
| Ball Corporation<br>PO Box 589<br>Broomfield, CO 80038-0589<br>email: supplierenablement@ball.com | Ball Corporation<br>email: pkgapwarehouse@ball.com |

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| September Rent | Net 60 | 10/31/2023 | 9/1/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.07 | 7,845.32 |

Thank you for your business!

| | | | Total | $119,921.28 |
|---|---|---|-------|-------------|

| Phone # | Fax # | E-mail | Balance Due | $119,921.28 |
|---------|-------|--------|-------------|-------------|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | | |

 **Co., Inc.**

PO Box 17401
Tampa FL  33682-7401

# Invoice

| Date | Invoice # |
|---|---|
| 10/1/2023 | 3255744A |

*PAST DUE*

**Bill To**

Ball Corporation
PO Box 589
Broomfield, CO 80038-0589
email: supplierenablement@ball.com

**Ship To**

Ball Corporation
email: pkgapwarehouse@ball.com

| Load # | Terms | Due Date | Ship Date | Ship Via |
|---|---|---|---|---|
| October Rent | Net 60 | 11/30/2023 | 10/1/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.07 | 7,845.32 |

Thank you for your business!

| | Total | $119,921.28 |
|---|---|---|

| Phone # | Fax # | E-mail | Balance Due | $119,921.28 |
|---|---|---|---|---|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | | |

 **Co., Inc.**

# Invoice

PO Box 17401
Tampa FL 33682-7401

| Date | Invoice # |
|------|-----------|
| 11/1/2023 | 3255745A |

**Bill To**

Ball Corporation
PO Box 589
Broomfield, CO 80038-0589
email: supplierenablement@ball.com

**Ship To**

Ball Corporation
email: pkgapwarehouse@ball.com

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| November Rent | Net 60 | 12/31/2023 | 11/1/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.07 | 7,845.32 |

Thank you for your business!

| | Total | $119,921.28 |
|-|-------|-------------|

| Phone # | Fax # | E-mail | Balance Due | $119,921.28 |
|---------|-------|--------|-------------|-------------|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | | |

 Co., Inc.

# Invoice

PO Box 17401
Tampa FL  33682-7401

| Date | Invoice # |
|---|---|
| 12/1/2023 | 3255750A |

**Bill To**

Ball Corporation
PO Box 589
Broomfield, CO 80038-0589
email: supplierenablement@ball.com

**Ship To**

Ball Corporation
email: pkgapwarehouse@ball.com

| Load # | Terms | Due Date | Ship Date | Ship Via |
|---|---|---|---|---|
| December Rent | Net 60 | 1/30/2024 | 12/1/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.06 | 6,724.56 |

Thank you for your business!

| | Total | $118,800.52 |
|---|---|---|

| Phone # | Fax # | E-mail | | |
|---|---|---|---|---|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | Balance Due | $118,800.52 |

 Co., Inc.

# Invoice 

PO Box 17401
Tampa FL  33682-7401

*PAST DUE*

| Date | Invoice # |
|---|---|
| 1/1/2024 | 3255751A |

| Bill To | Ship To |
|---|---|
| Ball Corporation<br>PO Box 589<br>Broomfield, CO 80038-0589<br>email: supplierenablement@ball.com | Ball Corporation<br>email: pkgapwarehouse@ball.com |

| Load # | Terms | Due Date | Ship Date | Ship Via |
|---|---|---|---|---|
| January Rent | Net 60 | 3/1/2024 | 1/1/2024 | Tampa FL |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.06 | 6,724.56 |

Thank you for your business!

| | **Total** | $118,800.52 |
|---|---|---|

| Phone # | Fax # | E-mail | **Balance Due** | $118,800.52 |
|---|---|---|---|---|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | | |



**Co., Inc.**

PO Box 17401
Tampa FL  33682-7401

# Invoice

PAST DUE

| Date | Invoice # |
|------|-----------|
| 2/1/2024 | 3255752A |

| Bill To | Ship To |
|---------|---------|
| Ball Corporation<br>PO Box 589<br>Broomfield, CO 80038-0589<br>email: supplierenablement@ball.com | Ball Corporation<br>email: pkgapwarehouse@ball.com |

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| February Rent | Net 60 | 4/1/2024 | 2/1/2024 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.06 | 6,724.56 |

Thank you for your business!

| | Total | $118,800.52 |
|--|-------|-------------|

| Phone # | Fax # | E-mail | | |
|---------|-------|--------|--|--|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | **Balance Due** | $118,800.52 |

 **Co., Inc.**

# Invoice

PO Box 17401
Tampa FL  33682-7401

| Date | Invoice # |
|------|-----------|
| 3/1/2024 | 3255753A |

| Bill To | Ship To |
|---------|---------|
| Ball Corporation<br>PO Box 589<br>Broomfield, CO 80038-0589<br>email: supplierenablement@ball.com | Ball Corporation<br>email: pkgapwarehouse@ball.com |

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| March Rent | Net 60 | 4/30/2024 | 3/1/2024 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.06 | 6,724.56 |

Thank you for your business!

| | **Total** | $118,800.52 |
|---|---|---|

| Phone # | Fax # | E-mail | | |
|---------|-------|--------|---|---|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | **Balance Due** | $118,800.52 |

 Co., Inc.

# Invoice

PO Box 17401
Tampa FL  33682-7401

| Date | Invoice # |
|------|-----------|
| 4/1/2024 | 3255757A |

| **Bill To** | **Ship To** |
|-------------|-------------|
| Ball Corporation<br>PO Box 589<br>Broomfield, CO 80038-0589<br>email: supplierenablement@ball.com | Ball Corporation<br>email: pkgapwarehouse@ball.com |

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| April Rent | Net 60 | 5/31/2024 | 4/1/2024 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Rent of 5806 North 53rd Street | 1 | 103,691.65 | 103,691.65 |
| Operating Costs | 1 | 8,384.31 | 8,384.31 |
| State of Florida Sales Tax on Rent | 112,075.96 | 0.06 | 6,724.56 |

Thank you for your business!

| | **Total** | $118,800.52 |
|--|-----------|-------------|

| Phone # | Fax # | E-mail | | |
|---------|-------|--------|--|--|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | **Balance Due** | $118,800.52 |

# WES FLO Co., Inc.

PO Box 17401
Tampa FL  33682-7401

# Invoice

PAST DUE

| Date | Invoice # |
|------|-----------|
| 3/31/2023 | 3225673P |

**Bill To**

Ball Corporation
PO Box 589
Broomfield, CO 80038-0589
email: supplierenablement@ball.com

**Ship To**

Ball Corporation
email: pkgapwarehouse@ball.com

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| Pest Control 215+223 | Net 60 | 5/30/2023 | 3/31/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Pest Control | 1 | 38.70 | 38.70 |
| State of Florida Sales Tax on Rent | 5.81 | 0.07 | 0.41 |
| Other Misc | 1 | 5.81 | 5.81 |
| 5707 N 54 St | | | |

Thank you for your business!

| | Total | $44.92 |
|--|-------|--------|

| Phone # | Fax # | E-mail | | |
|---------|-------|--------|--|--|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | Balance Due | $44.92 |

# Exhibit "D"

 **Co., Inc.**

PO Box 17401
Tampa FL  33682-7401

 # Invoice

*PAST DUE*

| Date | Invoice # |
|------|-----------|
| 3/31/2023 | 3225671P |

**Bill To**

Ball Corporation
PO Box 589
Broomfield, CO 80038-0589
email: supplierenablement@ball.com

**Ship To**

Ball Corporation
email: pkgapwarehouse@ball.com

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| Pest Control 290+293 | Net 60 | 5/30/2023 | 3/31/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Pest Control | 1 | 50.53 | 50.53 |
| State of Florida Sales Tax on Rent | 7.58 | 0.07 | 0.53 |
| Other Misc | 1 | 7.58 | 7.58 |
| 5806 N 53rd St | | | |

Thank you for your business!

| | | | **Total** | $58.64 |

| Phone # | Fax # | E-mail | **Balance Due** | $58.64 |
|---------|-------|--------|-----------------|--------|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | | |



**WES FLO Co., Inc.**

PO Box 17401
Tampa FL  33682-7401

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/31/2023 | 3225672P |

*PAST DUE*

**Bill To**

Ball Corporation
PO Box 589
Broomfield, CO 80038-0589
email: supplierenablement@ball.com

**Ship To**

Ball Corporation
email: pkgapwarehouse@ball.com

| Load # | Terms | Due Date | Ship Date | Ship Via |
|--------|-------|----------|-----------|----------|
| Pest Control 215+223 | Net 60 | 5/30/2023 | 3/31/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Pest Control | 1 | 127.93 | 127.93 |
| State of Florida Sales Tax on Rent | 19.19 | 0.07 | 1.34 |
| Other Misc | 1 | 19.19 | 19.19 |
| | | | |
| 5707 N 54 St | | | |

Thank you for your business!

| | Total | $148.46 |
|--|-------|---------|

| Phone # | Fax # | E-mail | Balance Due | $148.46 |
|---------|-------|--------|-------------|---------|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | | |



**WES FLO Co., Inc.**

PO Box 17401
Tampa FL 33682-7401

PAST DUE

# Invoice

| Date | Invoice # |
|---|---|
| 3/31/2023 | 3225670P |

**Bill To**

Ball Corporation
PO Box 589
Broomfield, CO 80038-0589
email: supplierenablement@ball.com

**Ship To**

Ball Corporation
email: pkgapwarehouse@ball.com

| Load # | Terms | Due Date | Ship Date | Ship Via |
|---|---|---|---|---|
| Pest Control 290+293 | Net 60 | 5/30/2023 | 3/31/2023 | Tampa FL |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| Rodent Control | 1 | 178.45 | 178.45 |
| State of Florida Sales Tax on Rent | 26.77 | 0.07 | 1.87 |
| Other Misc | 1 | 26.77 | 26.77 |
| 5806 N 53rd St | | | |

Thank you for your business!

| | Total | $207.09 |
|---|---|---|

| Phone # | Fax # | E-mail | Balance Due | $207.09 |
|---|---|---|---|---|
| (813) 626-2171 | (813) 621-1016 | accounting@wes-flo.com | | |