**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**WES-FLO CO., INC.,**

      Plaintiff,

v.                                                    Case No. 8:24-cv-01482-WFJ-AAS

**BALL METAL BEVERAGE**
**CONTAINER CORP.,**

      Defendant.

_____/

## <u>ORDER</u>

Before the Court are the parties' cross-motions for summary judgment. Defendant Ball Metal Beverage Container Corp. ("Ball Metal") moves for summary judgment on certain issues stipulated to by the parties, Dkt. 67, Plaintiff Wes-Flo Co., Inc. ("Wes-Flo") responded in opposition, Dkt. 73, and Defendant Ball Metal replied. Dkt. 80. Plaintiff Wes-Flo moves for partial summary judgment on the same stipulated issues, Dkt. 65, Defendant Ball Metal responded in opposition, Dkt. 75, and Plaintiff Wes-Flo replied. Dkt. 81. Upon careful consideration, the Court grants Defendant Ball Metal's motion and denies Plaintiff Wes-Flo's motion.

## BACKGROUND

Wes-Flo is a Florida corporation with its principal place of business in Hillsborough County, Florida. Dkt. 65 ¶ 1; Dkt. 76 ¶ 1. Ball Metal is a Colorado corporation authorized to conduct business in Florida, which produces aluminum

beverage cans and lids (the "products"). *Id.* A certain Master Warehouse Services Agreement—and its exhibits—governs this dispute, *see* Dkt. 65-1, which was entered into by the parties on July 1, 2017, and subsequently amended (collectively, the "warehouse agreement"). Dkt. 65 ¶ 2; Dkt. 76 ¶ 2.

Under the warehouse agreement, Plaintiff Wes-Flo would store pallets of Defendant Ball Metal's products at warehouses located at 5707 North 5th Street and 5806 North 53rd Street, Tampa, Florida 33610 (the "Warehouses"). Dkt. 65-1 at 8, 9. The Warehouses were owned by non-party G&I IX 5806 N. 53rd Street, LLC ("G&I"), and leased to Plaintiff Wes-Flo. *See* Dkt. 66-3. The Parties have stipulated that Plaintiff Wes-Flo did not have written consent to sublease to Defendant Ball Metal, as would have been required by the lease between G&I and Plaintiff Wes-Flo. Dkt. 66 at 3; *see* Dkt. 66-3 at 5 ("[Wes-Flo] shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge or hypothecate its leasehold interest or grant any concession or license within the Premises or sublease any portion thereof without [G&I]'s prior written consent . . . [.] [A]ny attempt to do any of the foregoing without obtaining [G&I]'s prior written consent shall be void and of no effect.").

The warehouse agreement labeled Plaintiff Wes-Flo as the "warehouseman," Dkt. 65-1 at 2, and stipulates that Plaintiff Wes-Flo was responsible for the handling of the pallets, *id.* at 8, 9 (detailing a handling rate for "Inbound/Outbound Per Pallet

2

of Cans & [Lids]"), storage of the pallets, *id.* at 2, and the maintenance of certain standards. *Id.* at 10–19.

Specifically, Wes-Flo adopted minimal standards "to prevent contamination and damage" as "[t]he empty can[s] may absorb strong or pungent odors and will also be damaged by contaminants such as (but not limited to): dust, water, dirt, insects, foreign debris, leaking equipment chemicals, etc. The empty cans are also susceptible to damage from material[,] handling equipment[,] and improper transporting." *Id.* at 10, 31, 35, 41. It is noted that these standards were especially important to Defendant Ball Metal, as "Ball customers' products are regulated by the government and must comply with strict guidelines regarding the package ultimately provided to the end consumer." *Id.* at 30. The standards encompassed a broad range of requirements, including sanitation of grounds and buildings, maintenance of building exteriors and interiors, pest control measures, storage practices, and warehouse security protocols. *See id.* at 10–19. The maintenance of these standards was to be verified through quality inspections performed by Defendant Ball Metal twice per year. *Id.* at 10.

Furthermore, under the warehouse agreement, Plaintiff Wes-Flo was established as "solely responsible for providing all personnel . . . , labor, materials, supplies, equipment, warehousing and other accessories necessary to properly receive, handle, store, track, and load and secure for shipment all Product." *Id.* at 2.

3

The warehouse agreement also provided procedures for warehousing operations, including ensuring that the "warehouseman is responsible for a daily inspection of the warehouse building to ensure proper operating conditions exist for a food grade and safe environment." *Id.* at 32, 36, 41. It is noted that Plaintiff Wes-Flo would be "expected to make reasonable attempts to backfill any seasonal or available warehouse space." *Id.* at 32, 36, 42.

In exchange for the aforementioned services, Defendant Ball Metal agreed to certain amounts for handling, storage, and delivery. *Id.* at 8, 9, 39–40. These amounts would be invoiced "for Storage Services performed on a weekly basis." *Id.* at 2.

The warehouse agreement also provided certain warranties, including that Plaintiff Wes-Flo's "execution, delivery or performance of this Agreement does not constitute an infringement or violation of any proprietary rights, intellectual property rights, or confidentiality rights of any third party." *Id.* at 4. The warehouse agreement was eventually amended to continue until April 30, 2024. *Id.* at 39.

On May 2, 2024, Plaintiff Wes-Flo filed this action against Defendant Ball Metal in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida. Dkt. 1-1. On June 19, 2024, this action was removed to the United States District Court for the Middle District of Florida. Dkt. 1. Plaintiff Wes-Flo filed the operative Second Amended Complaint on April 28, 2025, alleging causes of action against Defendant Ball Metal for breach of contract (Count I) and breach of

4

account stated (Count II). Dkt. 43. The underlying claim asserted by Plaintiff Wes-Flo is that Defendant Ball Metal "abruptly vacated" the Warehouses in July 2023, Dkt. 43 ¶ 11, which Defendant Ball Metal denies. Dkt. 46 ¶ 11. However, Defendant Ball Metal does admit to refusing to pay ensuing invoices for what Plaintiff Wes-Flo has subsequently labeled "rent" and "operating costs." Dkt. 43 ¶ 17; Dkt. 46 ¶ 17.

In an effort to avoid the "costs of expert disclosures and further discovery," the parties have "worked in good faith to narrow the issues to be presented in their competing summary judgment motions." Dkt. 66 at 2. The parties now seek summary judgment as to two stipulated issues. Dkts. 67, 65. The first stipulated issue is: "Whether, under the terms of the [warehouse agreement] and its exhibits, Wes-Flo was entitled as a matter of law, following Ball Metal's removal of its products from the [W]arehouses, to stand by, do nothing to mitigate, and sue for the relief sought in the Second Amended Complaint?" Dkt. 65 at 2; *see* Dkt. 66 at 3. Stated differently, whether "Wes-Flo occupies the legal position of a commercial landlord for purposes of interpreting and enforcing its rights and remedies against Ball Metal." Dkt. 73 ¶ 3. As such, the fundamental question the Court considers is whether the warehouse agreement was a lease subject to Florida commercial landlord-tenant law. Regarding this first issue, the parties have agreed "to confine their arguments solely to addressing the contents of the [warehouse agreement] itself, and all exhibits to the [warehouse agreement], and the parties will not raise or

5

rely upon any evidence outside of the literal four corners of that document." Dkt. 66 at 3 (emphasis omitted); *see* Dkt. 65 at 2 n.1.

If the Court were to find that the warehouse agreement was a lease as a matter of law, then the second stipulated issue asks the following: "Whether Ball Metal is precluded as a matter of law from raising as a defense Wes-Flo's lack of authority from [G&I] to enter into the [warehouse agreement]?" Dkt. 65 at 2; Dkt. 66 at 3. Regarding this second issue, the parties have agreed not to present any facts beyond the terms of the lease between G&I and Plaintiff Wes-Flo. Dkt. 74 at 3; *see* Dkt. 66-3.

## LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party.

6

*See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(c), (e). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). "The court may not weigh evidence to resolve factual disputes"; if a genuine issue of material fact is present, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment "[i]f reasonable minds could differ on the inferences arising from undisputed facts[.]" *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

The legal standard for summary judgment is especially important when there are cross-motions for summary judgment. "[C]ourts should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023). "When parties jointly move for summary judgment, the court has three options: granting summary judgment for the plaintiff under the defendant's

best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *Id.*

## DISCUSSION

The parties each seek summary judgment as to the two stipulated issues. The Court considers each issue as follows.

**I.    First Stipulated Issue: Whether, under the terms of the [warehouse agreement] and its exhibits, Wes-Flo was entitled as a matter of law, following Ball Metal's removal of its products from the warehouses, to stand by, do nothing to mitigate, and sue for the relief sought in the Second Amended Complaint?**[1]

The threshold matter for the first stipulated issue is the nature of the warehouse agreement—that is, whether it should be deemed a lease as a matter of law.[2] This question is dispositive for both motions because under Florida commercial landlord-tenant law, a lessor may elect upon breach to "stand by and do nothing, and sue the lessee as each installment of rent matures, or for the whole when it becomes due." *Hourglass Ent., LLC v. NRG Invs., Inc.*, 416 So. 3d 1195, 1197 (Fla. 2nd DCA 2025) (quoting *Williams v. Aeroland Oil Co.*, 155 Fla. 114, 20 So. 2d 346, 347–48

---

[1] The Court notes the following in its consideration of the first stipulated issue: "Wes-Flo withdraws paragraph 15 of its summary judgment motion from consideration, which is related to [the first stipulated issue], and the parties acknowledge that statements made in that paragraph are in dispute and will be among the facts determined at trial." Dkt. 74 at 3.

[2] Upon an undisputed factual basis, contractual interpretation is considered a matter of law to be determined by the Court. *See Action Nissan, Inc. v. Hyundai Motor Am.*, 617 F. Supp. 2d 1177, 1187 (M.D. Fla. 2008) ("When the language of a contract is clear and unambiguous, its interpretation or construction is a matter of law." (citing *Smith v. Shelton*, 970 So. 2d 450, 451 (Fla. 4th DCA 2007))); *see also Sunbelt Cranes Constr. & Hauling, Inc. v. Gulf Coast Erectors, Inc.*, 189 F. Supp. 2d 1341, 1347 (M.D. Fla. 2002) ("Ordinary rules of contract construction apply and the unambiguous terms of the lease must be construed based upon its plain language." (quoting *Dearing v. General Motors Acceptance Corp.*, 758 So. 2d 1236, 1239 (Fla. 5th DCA 2000))).

(Fla. 1944)). In contrast, under traditional Florida contract law, a non-breaching party is subject to the doctrine of avoidable consequences—"also somewhat inaccurately identified as the 'duty to mitigate' damages"—which "prevents a party from recovering those damages inflicted by a wrongdoer that the injured party could have reasonably avoided." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009) (citation modified). The question of mitigation thus rests upon whether the warehouse agreement was a lease subject to Florida commercial landlord-tenant law, or else another type of contract subject to traditional Florida contract law.

    *a.  Subject matter of the warehouse agreement*

To draw out this distinction, the Court first considers the principal subject matter of the warehouse agreement: either the Warehouses (real property) or Defendant Ball Metal's products (personal property). While a lease is concerned with real property, *see Heyman v. Cooper*, 31 F.4th 1315, 1320 (11th Cir. 2022) (citation modified) (defining a "lease" as "a contract by which a rightful possessor of real property conveys the right to use and occupy the property"), other forms of contracts—such as bailment contracts—are concerned with personal property. *See Emerson v. Lambert*, 374 So. 3d 756, 758 n.1 (Fla. 2023) (citation modified) (defining a "bailment" as "a delivery of personal property by one person . . . to another . . . who holds the property for a certain purpose").

9

Here, the Master Warehouse Services Agreement is principally concerned with the storage and handling of Defendant Ball Metal's products, not the transfer of any rights to real property. The body of the Master Warehouse Services Agreement provides that Plaintiff Wes-Flo "shall provide the storage services for [Defendant Ball Metal's] beverage containers" and details the manner in which those services are to be performed. Dkt. 65-1 at 2–6. Notably, the warehouse agreement contains no explicit grant of use or occupancy rights with respect to the Warehouses.

Instead, the Warehouses are first detailed in the exhibits, where they are identified as merely the "[l]ocations at which Services will be provided." *Id.* at 8, 9; *see also id.* at 31, 35, 38. Thus, the Warehouses function within the agreement as the situs of Plaintiff Wes-Flo's performance, rather than as the subject of any conveyance. Viewed as a whole, the warehouse agreement reflects a contractual arrangement under which Plaintiff Wes-Flo agreed to store and handle Defendant Ball Metal's products at designated facilities, not one under which Plaintiff Wes-Flo conveyed to Defendant Ball Metal a right to use and occupy those facilities. In that respect, the agreement more closely resembles a contract concerned with the custody and storage of personal property—such as a bailment contract—than a lease concerned with the conveyance of interests in real property.

### b. Requirements of a lease

To be certain that the warehouse agreement is not a lease, the Court considers the requirements for a lease. As noted above, the Eleventh Circuit has defined a "lease" as "a contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usually rent." *Heyman*, 31 F.4th at 1320 (citation modified) (quoting *Lease*, Black's Law Dictionary (11th ed. 2019)). The Florida Supreme Court has likewise emphasized that a lease involves the conveyance of the "right to use and occupy the property." *See City of Gulf Breeze v. Brown*, 397 So. 3d 1009, 1017 (Fla. 2024) (quoting *Lease*, Black's Law Dictionary (11th ed. 2019)). Thus, the Court must determine whether the warehouse agreement conveyed to Defendant Ball Metal "the right to use and occupy" the Warehouses.

Plaintiff Wes-Flo argues that Defendant Ball Metal exercised such a high degree of control over the Warehouses that it is as if Defendant Ball Metal was conveyed rights of use and occupancy. Dkt. 73 at 4–6. The Court is not persuaded. To the extent Plaintiff advances this theory, it conflates the articulation of quality-control standards over the performed services with the conveyance of rights in real property. The two are not interchangeable. The portions of the warehouse agreement cited by Plaintiff Wes-Flo demonstrate that Defendant Ball Metal imposed detailed standards governing: sanitation of grounds and buildings, maintenance of building

exteriors and interiors, pest control measures, storage practices, and warehouse security protocols. *See* Dkt. 65-1 at 10–19.

This arrangement is distinguishable from a recognized commercial warehouse lease, such as the agreement between G&I and Plaintiff Wes-Flo, wherein Plaintiff Wes-Flo was conveyed the right to "use" the "[g]eneral office [and] storage and distribution center" of the Warehouses. *See* Dkt. 66-3. It is likewise distinguishable from the authority relied upon by Plaintiff Wes-Flo, in which the agreement was found to create a lease for a "warehouse-within-a-warehouse." Dkt. 73 at 2–3 (citing *Assa Compañia de Seguros, S.A. v. Codotrans, Inc.*, No. 13-23563-CIV, 2015 WL 11202637 (S.D. Fla. Feb. 6, 2015)). There, the tenant was granted clear use and occupancy of a defined portion of the premises, including the exclusive use of an office and a fenced-in area within a warehouse. *Assa Compañia de Seguros, S.A.*, 2015 WL 11202637, at *2.

By contrast, the warehouse agreement merely arranged for the specialized storage and handling of products at a designated location. *See id.* at 10–19, 30, 31, 32, 35, 36, 41 (articulating the standards necessary for Plaintiff Wes-Flo to maintain a "food grade and safe environment" for the storage and handling of Defendant Ball Metal's products—cans and lids). The degree of oversight retained by Defendant Ball Metal with respect to the storage environment does not transform the warehouse agreement into a conveyance of a right to use and occupy real property.

The operational provisions of the warehouse agreement further confirm that Defendant Ball Metal did not retain use or occupancy rights in the nature of a lease. The warehouse agreement expressly established that Plaintiff Wes-Flo was "*solely responsible* for providing all personnel . . . , labor, materials, supplies, equipment, warehousing and other accessories necessary to properly receive, handle, store, track, and load and secure for shipment all Product." Dkt. 65-1 at 2 (emphasis added). Additionally, employees of Defendant Ball Metal visited the Warehouses only for semiannual quality inspections; otherwise, Plaintiff Wes-Flo would be the sole entity at the Warehouses. *Id.* at 10.

Under Plaintiff Wes-Flo's interpretation of the warehouse agreement as a lease, it would be unusual for the alleged landlord—Plaintiff Wes-Flo—to be exclusively responsible for all storage, handling, and day-to-day functions associated with the products and premises, whereas the alleged tenant—Defendant Ball Metal—would only access the premises twice a year. The Court accordingly finds that the warehouse agreement does not convey use and occupancy rights in the Warehouses.

Notwithstanding the issue of use and occupancy, Plaintiff Wes-Flo cites to certain Florida case law in an effort to define the elements of a lease. Dkt. 65 at 7 (citing *Waveblast Watersports II, Inc. v. UH-Pompano, LLC*, 291 So. 3d 657 (Fla. 4th DCA 2020)). The cited authority finds that a lease "must contain the following

13

essential terms: (1) the names of the parties; (2) a description of the demised realty; (3) a statement of the term of the lease; and (4) the rent or other consideration." *Waveblast*, 291 So. 3d at 660 (quoting 34 Fla. Jur. 2d Landlord and Tenant § 18). While Plaintiff Wes-Flo suggests that the presence of these elements is sufficient to establish a lease, *see* Dkt. 65 at 7, the cited authority does not hold so. *See Waveblast*, 291 So. 3d at 660. The court in this case was concerned with whether an agreement already understood to be a lease contained sufficiently definite terms to be enforceable. *See id.* at 660–61. These were thus identified as *necessary* terms of a lease, not *sufficient* ones; while *Waveblast* identifies certain terms commonly required for an enforceable lease, it does not hold that the mere presence of those terms is sufficient to transform any contract into a lease.

However, even if these were understood to be *sufficient* terms, the warehouse agreement still fell short of establishing a lease. One of the terms identified by the *Waveblast* court is "a description of the *demised* realty." *Id.* at 660 (emphasis added). Without any relevant precedent defining "demise," the Court turns to Black's Law Dictionary, as the Eleventh Circuit and Florida Supreme Court did to define the term "lease." *See Heyman*, 31 F.4th at 1320 (citation modified) (quoting *Lease*, Black's Law Dictionary (11th ed. 2019)); *see City of Gulf Breeze*, 397 So. 3d at 1017 (quoting *Lease*, Black's Law Dictionary (11th ed. 2019)). "Demise" is defined as "[t]he conveyance of an estate usu[ally] for a term of years[.]" *Demise*, Black's Law

14

Dictionary (12th ed. 2024). This term thus requires a description of an estate in real property that has been conveyed.

Here, although the warehouse agreement identified the Warehouses as the locations where Plaintiff Wes-Flo would perform storage services, *see id.* at 8, 9, 31, 35, 38 (describing the Warehouses as the "[l]ocations at which Services will be provided"), it contained no indication that an estate in the Warehouses was conveyed to Defendant Ball Metal. Thus, even assuming the warehouse agreement contains the other terms referenced in *Waveblast*, it lacks a description of *demised* real property; the Court finds references to the locations of performance to be insufficient. Accordingly, the warehouse agreement did not meet the requirements of a lease as outlined in caselaw.

### c. Language of the warehouse agreement

Aside from the requirements of a lease, Plaintiff Wes-Flo argues that the warehouse agreement should nonetheless be construed as a lease because there are instances where its exhibits referred to "*leased*, rented, or Ball owned warehouses." Dkt. 73 at 4 (quoting Dkt. 65-1 at 10). Although a lease—as a type of contract—is interpreted based upon its plain language, *see Sunbelt Cranes Constr. & Hauling, Inc. v. Gulf Coast Erectors, Inc.*, 189 F. Supp. 2d 1341, 1347 (M.D. Fla. 2002) (quoting *Dearing v. General Motors Acceptance Corp.*, 758 So. 2d 1236, 1239 (Fla. 5th DCA 2000)), such interpretation must be done "in the context of the entire [lease]

15

and construing the [lease] to effectuate the parties' intent." *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014) (citing *Moore v. Pa. Castle Energy Corp.*, 89 F.3d 791, 795-96 (11th Cir. 1996)); *see Davis v. Valsamis, Inc.*, 752 F. App'x 688, 692 (11th Cir. 2018) ("The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them." (quoting *O'Brien v. Miller*, 168 U.S. 287, 297 (1897))).

Here, when read as a whole, the Court finds that the plain language of the warehouse agreement unambiguously does not manifest an intent to render it a lease.[3] The agreement is consistent in its terms: Plaintiff Wes-Flo is never referred to as a lessor, sublessor, or landlord; instead, it is labeled a "warehouseman." *See* Dkt. 65-1. Defendant Ball Metal is also never referred to as a lessee, sublessee, or tenant. *See id.* Additionally, rather than granting any possessory interest in the Warehouses, the warehouse agreement mentions "Storage Services," *see id.*, and instead of discussing rent, it mentions a "Storage Rate." *See id.* Plaintiff Wes-Flo recognizes that the warehouse agreement "is not titled as a 'lease[.]'" Dkt. 81 at 4. The Court finds that, almost every time the warehouse agreement could have used

---

[3] A district court in this Circuit has found that although nomenclature is persuasive in the determination of a lease, a limited number of potentially inconsistent terms does not have "thaumaturgical powers" to transmute a contract for storage services into a lease. *Davis Constr. Supply, LLC v. Merchs. Transfer Co.*, 676 F. Supp. 3d 1192, 1197 (S.D. Ala. 2023) (interpreting Alabama law).

16

nomenclature typical of a lease, it instead used language more typical of something like a services contract.[4] Accordingly, the warehouse agreement was not a lease as a matter of law.

Plaintiff Wes-Flo then contends that, "whether or not it is technically a landlord and whether or not the [warehouse agreement] is technically a lease, it is entitled to the same right afforded to commercial landlords to, 'stand by and do nothing, and sue the lessee as each installment of rent matures, or for the whole when it becomes due.'" Dkt. 81 at 4 (quoting *Williams v. Aeroland Oil Co.*, 20 So. 2d 346, 348 (Fla. 1944)). Plaintiff Wes-Flo requests that, if the Court finds the warehouse agreement is not a lease, it be found to be sufficiently "lease like," which entitles Plaintiff Wes-Flo to "stand by and do nothing." *Id.* at 4, 6. Plaintiff does not cite— and the Court cannot find—any authority for this "slight extension of existing law," Dkt. 65 at 8, and thus declines to construe the warehouse agreement as such.

Therefore, as a matter of law, Plaintiff Wes-Flo was not entitled to "stand by and do nothing" prior to the present action. The Court finds that summary judgment is due to be granted in favor of Defendant Ball Metal as to the first stipulated issue.

---

[4] The Court merely answers the First Stipulated Issue presented to it and only determines whether the warehouse agreement is a lease or is not a lease. The Court declines to make a holding as to what other form of contract the warehouse agreement might be.

**II.   Second Stipulated Issue: Whether Ball Metal is precluded as a matter of law from raising as a defense Wes-Flo's lack of authority from G&I to enter into the [warehouse agreement]?**[5]

As to the second stipulated issue, Plaintiff Wes-Flo argues that "lessees are estopped from denying their lessors' title, during the existence of the relationship of landlord and tenant." Dkt. 65 at 8 (quoting *Avila S. Condo. Ass'n, Inc. v. Kappa Corp.*, 347 So. 2d 599, 603 (Fla. 1977)). Specifically, Plaintiff claims that Defendant Ball Metal is "precluded, as a matter of law on the stipulated record, from asserting a defense premised on Wes-Flo's lack of landlord authorization under Section 8 of the Wes-Flo/G&I lease." *Id.* at 10. This issue thus "only becomes material if this Court . . . finds that the [warehouse agreement] was a lease[.]" Dkt. 67 at 20. Here, Plaintiff Wes-Flo's argument is now immaterial because the Court has found that the warehouse agreement is not a lease as a matter of law. Therefore, this stipulated issue has been resolved, and the Court grants summary judgment in favor of Defendant Ball Metal.

---

[5] The Court notes the following in its consideration of the second stipulated issue: "Ball Metal withdraws from consideration at summary judgment Section VIII of its partial summary judgment motion, which pertains to fraud and/or fraudulent inducement. Ball Metal withdraws the affidavits filed in support of Section VIII, and the parties acknowledge that Wes-Flo disputes the facts stated in those affidavits and the reference to or consideration of the same as 'Material Undisputed facts'. . . . Ball Metal's allegations of fraud and fraudulent inducement, along with its other defenses, are preserved for trial." Dkt. 74 at 2. Additionally, "Section VII of Ball Metal's partial summary judgment motion, which addresses Wes-Flo's lack of written consent from its landlord and Ball Metal's contention of a corresponding breach of Section 10 of the [warehouse agreement], remains properly before the Court at summary judgment[.]" *Id.* at 3.

18

**CONCLUSION**

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendant Ball Metal Beverage Container Corp.'s Motion for Summary Judgment, Dkt. 67, is **GRANTED** in favor of Defendant Ball Metal Beverage Container Corp. and against Plaintiff Wes-Flo Co., Inc. as to the first stipulated issue. Plaintiff Wes-Flo Co., Inc.'s Motion for Partial Summary Judgment, Dkt. 65, is **DENIED** as to the first stipulated issue.

   a. Under the terms of the Master Warehouse Services Agreement and its exhibits, Plaintiff Wes-Flo Co., Inc. was not entitled as a matter of law, following Defendant Ball Metal Beverage Container Corp.'s removal of its products from the warehouses, to stand by, do nothing to mitigate, and sue for the relief sought in the Second Amended Complaint.

2. Defendant Ball Metal Beverage Container Corp.'s Motion for Summary Judgment, Dkt. 67, is **GRANTED** in favor of Defendant Ball Metal Beverage Container Corp. and against Plaintiff Wes-Flo Co., Inc. as to the second stipulated issue. Plaintiff Wes-Flo Co., Inc.'s Motion for Partial Summary Judgment, Dkt. 65, is **DENIED** as to the second stipulated issue.

3. The case proceeds to trial on all remaining issues.

**DONE** and **ORDERED** in Tampa, Florida, on June 9, 2026.

/s/ William F. Jung
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**Copies Provided To**
Counsels of Record